CIKLIN, J.
 

 The appellant, Dennis Cox, appeals his convictions for robbery with a firearm and attempted second degree murder with a firearm. He asserts the State violated his Sixth Amendment right to counsel by strategically and surreptitiously inducing incriminating statements from him after his right to counsel had attached. Because the State affirmatively engaged in conduct that was the functional equivalent of an interrogation during which time the appellant’s attorney was not present, we must
 
 *669
 
 reverse his conviction and order a new trial.
 

 During a four hour interrogation session, three detectives used a multitude of techniques designed to elicit incriminating statements from Cox. In fact, the trial court suppressed all post-invocation statements made by Cox save for a highly prejudicial seven minute interrogation room conversation with one of his co-defendants. In excluding the seven minute conversation from his order of suppression, the trial judge reasoned that in-custody conversations are generally not protected because they are made in a setting in which a criminal suspect does not have a reasonable expectation of privacy.
 

 For the reasons we explain, the trial court erred. Not only did law enforcement officials purposefully create a false illusion of privacy within the interrogation room but, working in concert, designedly utilized a co-defendant to whom they made promises of leniency in exchange for baiting Cox to utter incriminating statements. The seven minute conversation between Cox and his co-defendant should have been encompassed within the trial court’s overall interrogation room suppression order. Because the published seven minute video recording constituted the very heart of the State’s evidence against Cox, this cannot be considered harmless error.
 

 Facts
 

 The Crime
 

 On October 10, 2005, three men, one of whom was armed, arrived at The Dollar Store in Pompano Beach, Florida. A video surveillance camera showed that at approximately 7:30 p.m., the first man entered the store and approached the cash register clerk. While the first man was getting change from a dollar bill, another man approached carrying a small dark colored revolver and shot the clerk. The third man ran over and took cash from the register. All three then fled the scene.
 

 A person unrelated to the crime identified Christopher McCall as the first man to enter the store. McCall was brought in for questioning and identified Cox as the shooter. On October 12, 2005, Cox was taken into custody by law enforcement officials from the Broward County Sheriffs Office. At 12:06 p.m., Cox was brought into the interrogation room.
 
 [1]
 

 The Invocation of Rights
 

 At 1:47 p.m., Detectives Matthew Marks and Frank Bailante entered the interrogation room and read Cox his Miranda
 
 [2]
 
 rights. After giving Cox the opportunity to read each of his constitutional rights, Detective Bailante memorialized the review by procuring Cox’s signature on a pre-printed form. Both verbally and in writing, Cox invoked his Sixth Amendment right to counsel.
 

 The Questioning Continues
 

 At 1:56 p.m. Detective Bailante exited the interrogation room but Detective Marks remained to fill out paperwork.
 
 [3]
 
 Cox briefly “reinitiated” questioning by asking to see various crime scene photos in the detective’s investigative file.
 

 
 *670
 
 [1:57 p.m.]
 

 Cox: I can look at that? (Indicating the investigative file with photos)
 

 Det. Marks: You will be seeing all this soon enough.
 

 Cox: Why can’t I look at it now?
 

 Det. Marks: All of this pertains to the investigation that is being conducted on you. You know why you are here.
 

 Cox: You all still ain’t tell me.
 

 Det. Marks: You are here about the robbery over at the Dollar Store.
 

 At this time, Detective Bailante re-entered the interrogation room and informed Detective Marks that he could not ask Cox any questions because of Cox’s previous invocation of the right to counsel but could show him the photos in the file. After both detectives left the room for a brief period, Detective Marks re-entered:
 

 [2:00 p.m.]
 

 Det. Marks: I just got to make something clear. You had signed this form saying that you didn’t want to speak to me without an attorney present. But while I was filling out this paperwork here you started speaking to me, okay.... You did what is known as re-initiating the conversation. Which means you are talking to me now. If you are wishing to continue to speak to me, that’s fine. I have no problems talking to you and you talking to me. But, has your position changed? Are you willing to speak with me now?
 

 Cox: By me looking at that ... (unintelligible) ... Where the [pre-printed
 
 Miranda
 
 rights form] at so I can sign?
 

 Thereafter, Detective Marks returned the
 
 Miranda
 
 rights form to Cox and, to the question asking whether he wished to speak to law enforcement officials without his attorney present, changed his written answer from “No” to ‘Wes.” Detective
 

 Marks then once again began questioning Cox about his whereabouts on the night of the robbery when Detective Bailante reentered the interrogation room.
 

 [2:03 p.m.]
 

 Det. Bailante: Where are we at? What? He wanted to see the stuff? You’re saying you want to talk about this a little bit now?
 

 Cox: He told me (indicating Detective Marks) I can’t be asking to look at this (indicating the photos in the file) without—
 

 [[Image here]]
 

 [2:03 p.m,]
 

 Det. Marks: No, no, no. You’re misunderstanding. What I am saying is I’m sitting here, doing paperwork, you’re talking to me. By you talking to me you’re reinitiating conversation with me after you told us you did not want to speak to us, okay?
 

 * * *
 

 [2:06 p.m.]
 

 Cox: You are saying something I did not say. I wanted to look at the photo. I didn’t want you to ask me nothing....
 

 Det. Bailante: Okay. Here is what we are going to do. Listen to me to what I’m telling you. We are done now. Please understand that. We should have been done before.
 

 At this time it was clear Cox did not want to speak with law enforcement officials without an attorney present. In fact, all testimonial evidence from this point forward was suppressed by the trial court except for an ensuing seven minute conversation with Cox’s co-defendant.
 

 Detective Bailante then exited leaving Detective Marks to inform Cox that another detective would soon be entering the interrogation room for purposes of per
 
 *671
 
 forming a gunshot residue test on Cox’s hands. Detective Marks then left the room, leaving Cox alone. After Marks exited, Cox began wiping his hands under his armpits, biting and licking his fingernails, and coughing into his hands. (This non-testimonial evidence was permissibly published to the jury).
 

 The “Family Friend” Interrogator Enters the Room
 

 Law enforcement officials then sent a third detective into the interrogation room seemingly for the purpose of performing the gunshot residue test. Although Cox had already invoked his Sixth Amendment right to counsel, Detective Lacy Crew continued the interrogation. He removed Cox’s handcuffs and began the conversation with an apparent attempt to gain his trust.
 

 [2:41 p.m.]
 

 Det. Crew: I dealt with your dad a few times when he got jammed up. You know what the one thing about him that was good? He always told the truth.
 

 [[Image here]]
 

 [2:55 p.m.]
 

 Det. Crew: I came here, made a special trip all the way from Pompano because I know your dad, (unintelligible) ... to give you an opportunity to help yourself.
 

 Detective Crew also asked Cox about his brother and cousin, both of whom Detective Crew said he had dealt with in the past. When Cox denied involvement in the robbery by stating he was with family at the time of the crime, Detective Crew said he knew his “Aunt Sylvia.” Although subtle, Detective Crew’s attempts to befriend Cox would ultimately prove successful.
 

 Deliberate Versus Accidental Shooting
 

 Throughout Detective Crew’s conversation and interrogation of Cox (all of which was suppressed by the trial court), Crew made efforts to convince Cox that confessing to an
 
 accidental
 
 shooting would assist Cox in lightening his sentence.
 

 [2:42 p.m.]
 

 Det. Crew: This is the time right here. You never gonna have another opportunity to say, “Hey look, I made a mistake. This was an accident.”
 

 [[Image here]]
 

 [2:43 p.m.]
 

 Det. Crew: Minimize your loss by coming up with the truth.... The bottom line is when we go to court, do you want the judge and jury to say, “This is a hardened criminal, a cold blooded killer”? Or, do you want them to say, “This was a mistake”?
 

 ⅝ * *
 

 [2:54 p.m.]
 

 Det. Crew: What if we catch the other guy and he give a complete statement against you. First one talk, first one that get help. State attorney’s office may say, “Hey you know what, this guy here he sat there and lie to you, give him the max. This guy, who showed some remorse, said he was sorry for what he did. Told the truth right off the bat. Let’s try to help him out.”
 

 [[Image here]]
 

 [3:03 p.m.]
 

 Det. Crew: Did you deliberately shoot somebody? That’s a big difference. I’m giving you the ball, you want to run with it or not?
 

 [[Image here]]
 

 [3:05 p.m.]
 

 Det. Crew: If you tell me “I went in there with that gun. I shot that guy.
 
 *672
 
 I tried to kill him. I robbed him” ... then the worst thing is going to happen to you. But, if you tell me “I went in there with the gun, it was a mistake, I didn’t try to shoot him”... that’s a whole different story. But as it stand right now with you not saying nothing and that guy saying, “He went in there with me and he shot this guy, deliberately, and I know he did” ... he is going to come into court and he is going to look like the good guy.
 

 Detective Crew also told Cox his sentence for robbery could range from a youthful offender program to a life sentence. He said the sentence would depend on the information that Cox provided in the interrogation room. Detective Crew reiterated that a remorseful defendant who just
 
 accidentally
 
 discharged the weapon involved in the incident would receive a lighter sentence.
 

 It was at this point that Cox changed his adamant denial of any involvement in the crime. Instead of denying participation, Cox told Detective Crew that he was willing to answer questions and make admissions.
 

 The Family Friend’s Assurance of Privacy in the Interrogation Room
 

 Before answering questions and providing details of the robbery, Cox indicated a strong hesitancy to talk in the interrogation room out of fear that the conversation was being recorded. Detective Crew assured Cox that no recording was being made and the conversation was being conducted in private.
 

 [2:59 p.m.]
 

 Det. Crew: Are you going to be able to answer my questions?
 

 * * *
 

 [3:00 p.m.]
 

 Cox: I ain’t fixin’ to talk to you right here right now in this place knowing I am being recorded.
 

 Det. Crew: Who is recording you?
 

 Cox: Man ... I ain’t talking nowhere in no enclosed place. No buildings. I will talk to you outside.
 

 Det. Crew: Do you see any camera around anywhere?
 

 Cox: Am I supposed to see it?
 

 Det. Crew: If we was recording you, yeah. We got a room where we take you in and the camera is sitting right there and we talking.
 

 [[Image here]]
 

 [3:08 p.m.]
 

 Cox: I will talk to you and let you know what I know about the robbery but we cannot be in this building right now bro.
 

 [[Image here]]
 

 [3:10 p.m.]
 

 Det. Crew: Nobody in here but me and you. Again, whose idea was this?
 

 After this ten minute exchange filled with false assurances of privacy, Cox began to confess. He stated the robbery was not his idea; he was merely on the way to his grandmother’s house when he was approached by a co-defendant. However, Cox again expressed a continuing concern that his conversation with and confession to Detective Crew was being recorded.
 

 [3:12 p.m.]
 

 Det. Crew: Now don’t you feel better talking about this?
 

 Cox: But I swear we are being recorded right now man.
 

 Det. Crew: Listen to me man. Do you see anybody in this room?
 

 Cox: No.
 

 Det. Crew: Go ahead. Stop going backwards. Let’s continue going forward.
 

 
 *673
 
 Cox finally relented. He told Detective Crew that he followed another man into the Dollar Store. He stated that he raised his gun at the clerk behind the register as he approached the counter, but it discharged by accident. Detective Crew again asked if the shooting was deliberate, to which Cox answered in the negative.
 
 [4]
 

 Law Enforcement’s Orchestration with a Co-Defendant
 

 The most incriminating evidence introduced at trial derives from a seven minute conversation with a co-defendant, Christopher McCall, which the trial court specifically excluded from its suppression order. Prior to entering the interrogation room, McCall was told by law enforcement officials that he could expect leniency from the State Attorney’s office if he was able to elicit incriminating statements from Cox.
 
 [5]
 
 Accompanied by Detective Crew, McCall was placed in the interrogation room with Cox and the three began a conversation:
 

 [3:34 p.m.]
 

 Det. Crew: Now Chris. He (indicating to Cox) already told me what happened. What happened?
 

 McCall: I was at the place (Unintelligible), at the Dollar Store ... (Unintelligible).
 

 [[Image here]]
 

 [3:35 p.m.]
 

 Det. Crew: Did you know you guys was gonna rob the place?
 

 McCall: When he told me ... (Unintelligible). When we was on the outside.
 

 * * ⅞
 

 [3:35 p.m.]
 

 Det. Crew: Did he shoot him deliberately or was it an accident?
 

 McCall: He shot the guy deliberately.
 

 Immediately after McCall made the statement that Cox “deliberately” shot the store clerk, Detective Crew purposefully exited the interrogation room so that both defendants were left alone. Cox, still unaware that the interrogation room was wired to record, confronted McCall by making highly charged inculpatory statements which would become the hallmark of the State’s prosecution against him.
 

 [3:35 p.m.]
 

 Cox: How you saying to them I meant to shoot the damn man?
 

 McCall: (Unintelligible)
 

 Cox: You telling them I meant to do that bro. You know how much time I can get for meaning to do something bro.
 

 McCall: I ain’t gonna do nothing.
 

 Cox: Okay. That ain’t the point bro. So I meant to shoot him, that what you tellin him? So I meant to shoot him?
 

 McCall: I don’t know I ain’t doin nothing.
 

 [[Image here]]
 

 [3:36 p.m.]
 

 Cox: Shit was a motha fuckin accident; you talking about deliberate. I ain’t gonna sweat it bro. I’m gonna leave that shit alone. All that lying gonna
 
 *674
 
 catch up with you man. I’m locked up. I can’t do nothing. There are plenty of people on the outside. Talking about I meant to do that shit man. Best thing for you to do bro is say that was an accident. It’s like six witnesses against you.
 

 * ⅜ *
 

 [3:37 p.m.]
 

 Cox: I’m telling this man it was an accident. Everybody fixin’ to get a low sentence because it was an accident. You sitting here with all that deliberate shit. You know how much time that shit gonna get your dumb ass with that one word, “deliberate”?
 

 McCall: (Unintelligible)
 

 Cox: An accident, we ain’t getting shit ... eight months, twelve months, year and a half the most.
 

 [[Image here]]
 

 [3:39 p.m.]
 

 Cox: I ain’t pull that trigger ... that gun went off by itself.
 

 At this point, Detective Crew opened the door to the interrogation room and reentered it. McCall was dismissed and removed from the room.
 

 After a three day trial and three hours of deliberation, the jury returned guilty verdicts for (count I) robbery with a firearm and (count II) attempted second degree murder with a firearm. Cox was sentenced to life in prison on count I and 30 years on count II that included minimum mandatory sentences because of special findings by the jury that a firearm was possessed and discharged and that great bodily harm was inflicted.
 

 Cox’s primary contention on appeal is that the State violated his Sixth Amendment right to counsel by covertly and tactically inducing incriminating statements from him after his right to counsel had attached. Cox argues that law enforcement officers created a reasonable expectation of privacy in his interrogation room by making repeated assurances that the interrogation was not being recorded. Cox also asserts that law enforcement’s use of a co-defendant, as a medium to induce incriminating statements from him, violated his right to counsel as the co-defendant was acting as an agent of the state.
 

 The State argues that the publication of Cox’s confrontation with his co-defendant was not inconsistent with his Sixth Amendment right to counsel because criminal defendants do not enjoy a reasonable expectation of privacy in an interrogation room.
 

 Analysis
 

 Standard of Review
 

 When reviewing a trial court’s order on a motion to suppress, an appellate court affords a presumption of correctness with respect to the determination of historical facts, but “independently review[s] mixed questions of law and fact that ultimately determine constitutional issues.”
 
 See Welch v. State,
 
 992 So.2d 206, 214 (Fla.2008).
 

 Constitutional Protections
 

 Both the Federal and Florida Constitutions provide as fundamental the right against self-incrimination.
 
 [6]
 
 As a means of protection, criminal defendants are entitled to the warnings announced in
 
 Miranda
 
 before any custodial interrogation.
 
 See Miranda,
 
 384 U.S. at 444-45, 86 S.Ct. 1602. “[T]he requirement of giving
 
 Miranda
 
 warnings before custodial interrogation is a prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings.”
 
 *675
 

 Cuervo v. State,
 
 967 So.2d 155, 165 (Fla.2007) (quoting
 
 Davis v. State,
 
 698 So.2d 1182, 1189 (Fla.1997) (emphasis omitted)).
 

 Pursuant to
 
 Miranda,
 
 the term “interrogation” refers not only to express questioning, but “any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.”
 
 Rhode Island v. Innis,
 
 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). (footnote omitted). The Court explained:
 

 This focus reflects the fact that the
 
 Miranda
 
 safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective px*oof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they
 
 should have known
 
 were reasonably likely to elicit an incriminating response.
 

 Innis,
 
 446 U.S. at 301-02, 100 S.Ct. 1682 (footnote omitted) (emphasis in original).
 

 A criminal defendant can waive his or her
 
 Miranda
 
 rights and proceed with questioning provided the waiver is made voluntarily, knowingly and intelligently.
 
 See Miranda,
 
 384 U.S. at 444-45, 86 S.Ct. 1602. However, a suspect’s request to cut off questioning until counsel can be obtained must be “scrupulously honored” by the police.
 
 See Michigan v. Mosley,
 
 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
 

 Turning to the facts of this case, there can be no debate that Cox initially invoked his right to counsel. However, by asking to view the photos in the law enforcement investigative file, we find (as did the trial court) that Cox re-initiated discussion allowing for the resumption of his interrogation.
 
 See Edwards v. Arizona,
 
 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981);
 
 see also Pirzadeh v. State,
 
 854 So.2d 740, 743 (Fla. 5th DCA 2003)(“[W]hen an accused has invoked his right to counsel, all interrogation must cease immediately until counsel is made available, unless the accused reinitiates further communication with law enforcement.”).
 

 Nevertheless, Cox explained that he merely wanted to see the photos, not engage in further discussion. Recognizing that Cox again invoked his right to counsel, the trial court appropriately suppressed all police questioning from this point forward — except for the seven minute conversation between Cox and a co-defendant.
 

 Reasonable Expectation of Privacy
 

 Cox argues that his seven minute “jailhouse conversation” with a co-defendant should have been included in the trial court’s suppression order because law enforcement officials misrepresented the truth as to the privacy of his interrogation. The State contends no error occurred because incarcerated inmates have no reasonable expectation of privacy while in law enforcement custody.
 

 “A citizen’s right to privacy ... is determined by a two prong test: 1) whether the citizen had a subjective expectation of privacy; and 2) whether that expectation was one that society recognizes as reasonable.”
 
 Williams v. State,
 
 982 So.2d 1190, 1194 (Fla. 4th DCA 2008) (citing
 
 State v. Smith,
 
 641 So.2d 849, 851 (Fla.1994)).
 

 
 *676
 
 It has long been held that inmates do not have a reasonable expectation of privacy in jail.
 
 See Lanza v. New York,
 
 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962);
 
 see also Allen v. State,
 
 636 So.2d 494, 496-97 (Fla.1994). Therefore, most conversations and confessions in a police interrogation room are admissible as evidence.
 
 See Pestano v. State,
 
 980 So.2d 1200, 1202 (Fla. 3d DCA 2008) (citing
 
 Larzelere v. State,
 
 676 So.2d 394 (Fla.1996)). However, when law enforcement deliberately fosters an expectation of privacy, especially for the purpose of circumventing a defendant’s right to counsel, subsequent jailhouse conversations and confessions are inadmissible.
 
 Allen,
 
 636 So.2d at 497.
 

 In
 
 State v. Calhoun,
 
 479 So.2d 241 (Fla. 4th DCA 1985), this court suppressed a videotaped jailhouse conversation between the incarcerated inmate and his brother because the statements therein were made while the defendant had a reasonable expectation of privacy. In
 
 Calhoun,
 
 the defendant was placed in an interview room equipped with a concealed video camera. Before speaking with law enforcement officials, the defendant asked to talk to his brother (also in custody on unrelated charges) in private. The two brothers spoke for about five minutes without being recorded. Thereafter, law enforcement terminated the conversation and the defendant invoked his
 
 Miranda
 
 rights. Nevertheless, law enforcement officers (admittedly for strategic
 
 “investigative
 
 purposes”) placed the defendant’s brother back in the interview room, and recorded a fifteen minute conversation between the two men.
 
 Id.
 
 at 242-43 (emphasis in original).
 

 This court held that suppression of the fifteen minute videotaped conversation between the defendant and his brother was appropriate because the defendant had a “clear expectation of privacy ... deliberately fostered by the police officers.”
 
 Id.
 
 at 243. This court stated:
 

 [Ajfter the first conversation the defendant specifically exercised his right to remain silent and his right to counsel. Not only were these rights totally ignored by the police but the officers circumvented them by bringing the brother back into the room and then taping the conversation which is the subject of the motion to suppress. To rule that under these circumstances the defendant’s statements to his brother are admissible is to make a mockery of the
 
 Miranda
 
 rights.
 

 Calhoun,
 
 479 So.2d at 243.
 

 The instant case presents similar events. Cox, after invoking his
 
 Miranda
 
 rights, told Detective Crew that he did not want to talk about the alleged robbery out of fear the conversation was being recorded. Detective Crew then repeatedly and convincingly assured Cox that no such recording was being performed. It was after these assurances that Cox began answering Detective Crew’s questions and subsequently, making incriminatory statements to a co-defendant strategically placed inside the interrogation room by law enforcement officials. These police actions created a reasonable expectation of privacy in the interrogation room and should have led to inclusion of the seven minute jailhouse conversation with the other evidence suppressed at trial.
 

 Use of Co-Defendant as an Agent of the State
 

 Admission of the interrogation room conversation was also in error because the statements made therein were deliberately elicited by the co-defendant, Christopher McCall, who was acting as an agent of the state.
 

 
 *677
 
 In
 
 Massiah v. United States,
 
 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the United States Supreme Court held that the Sixth Amendment prohibits law enforcement officials from deliberately eliciting statements from a defendant after the right to counsel has attached. “[Statements ‘deliberately elicited’ from a defendant after the right to counsel has attached and in the absence of a valid waiver are rendered inadmissible and cannot be used against the defendant at trial.”
 
 Rolling v. State,
 
 695 So.2d 278, 290 (Fla.1997) (citing
 
 Massiah,
 
 377 U.S. at 206, 84 S.Ct. 1199). “For the fruits of postin-dictment interrogations to be admissible in a prosecution’s case in chief, the State must prove a voluntary, knowing, and intelligent relinquishment of the Sixth Amendment right to counsel.”
 
 Michigan v. Harvey,
 
 494 U.S. 344, 348-49, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).
 

 The “deliberately elicited issue” often arises when incriminatory statements are obtained by those persons acting as police informants or agents.
 
 See Rolling,
 
 695 So.2d at 290. In
 
 Rolling,
 
 the court held that “[u]sually, determining whether the ‘deliberately elicited’ standard has been met becomes an issue in cases, like this one, where incriminatory statements from a defendant were obtained through persons other than the police who allegedly acted as police informants or surrogates.”
 
 Id.
 

 The key to the inquiry is whether a confession was “obtained through the active efforts of law enforcement.”
 
 Id.
 
 at 291;
 
 see, e.g., United States v. Henry,
 
 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (use of a paid jailhouse informant to stimulate conversation with defendant rendered incriminating statements inadmissible at trial);
 
 Massiah, 377
 
 U.S. at 201, 84 S.Ct. 1199 (arranging for co-defendant to meet and discuss pending case in co-defendant’s wire-tapped car met the “deliberately elicited” standard). Further, this analysis does not require the alleged agent have knowledge of his or her role in “deliberately eliciting” statements from a defendant in violation of his right to counsel.
 
 See, e.g., Calhoun,
 
 479 So.2d at 245 (placement of defendant’s brother in defendant’s videotaped interrogation room rendered the brother an unwitting agent of law enforcement and allowed the Sheriffs agents to vicariously initiate and participate in a post
 
 -Miranda
 
 interrogation that law enforcement could not legally accomplish directly).
 

 In the instant case, law enforcement officials actively participated in a plan to elicit incriminating statements from Cox after Cox had invoked his right to counsel. Law enforcement officials planted co-defendant McCall in the interrogation room with the specific intent to evoke an incriminatory response. Moreover, it is clear that police investigators intended to spark a debate between the two suspects as to the deliberateness of the alleged shooting by leaving them to argue in the interrogation room. Accordingly, we conclude that the trial court erred in denying the motion to suppress Cox’s statements made during this seven minute conversation.
 

 The Question of Harmless Error
 

 “The erroneous admission of statements obtained in violation of
 
 Miranda
 
 rights is subject to harmless error analysis.”
 
 Mansfield v. State,
 
 758 So.2d 636, 644 (Fla.2000). “The harmless error test ... places the burden on the state ... to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.”
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1135 (Fla.1986). While the harmless error test requires an examination of the permissible
 
 *678
 
 evidence on which the jury could have relied, an appellate court must make “an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.”
 
 Id.
 
 at 1135.
 

 In
 
 Rigterink v. State,
 
 2 So.3d 221 (Fla.2009), the Florida Supreme Court held that the introduction of a defendant’s videotaped statements taken in violation of the Sixth Amendment right to counsel was harmful error. In that case, the State made the videotaped statements a centerpiece of its case against the defendant, presenting the tape during opening statements, its case-in-chief and closing argument. The court held that while the State may have presented admissible evidence sufficient to uphold the verdict, “[t]he test is not whether the jury reached what we believe to be the correct result but is, instead, whether a reasonable possibility exists that the constitutional violation
 
 contributed
 
 to the defendant’s convictions.”
 
 Id.
 
 at 257 (emphasis added).
 

 In the prosecution of Cox, the admissible evidence introduced by the State included testimony from two co-defendants, one of whom was an admitted crack addict who was high on drugs during the night of the alleged robbery. Both men identified Cox as the shooter but denied any role in planning the robbery. Both co-defendants acknowledged that they had received significant plea bargains for greatly reduced sentences in exchange for their cooperation and testimony in the case against Cox. The State introduced testimony from law enforcement officers who arrived on the scene of the crime and found the victim lying in a pool of blood behind the register. At no time, however, was the State able to introduce the firearm used during the robbery nor was the victim able to positively identify the shooter. There was no physical evidence linking Cox to the crime and a store videotape was of very poor quality and difficult to decipher.
 

 As in
 
 Rigterink,
 
 the State initially mentioned the existence of the “jailhouse conversation” between Cox and McCall during its opening statement. The State began its case in chief by publishing the first two hours of the interrogation video that showed Cox answer preliminary questions and adamantly deny involvement in the robbery. Next, and after a large portion of the interrogation video suppressed below was skipped, the seven minute “jailhouse conversation” between Cox and McCall was twice published to the jury in whole or in part. Portions of this conversation were played for a third time during the State’s closing argument.
 

 Upon a close examination of this impermissible evidence — which served as a centerpiece of the evidence against Cox — it cannot be said that its admission, beyond a reasonable doubt, did not contribute to the verdict. Therefore, the trial court’s error in admitting the “jailhouse conversation” was not harmless.
 

 Conclusion
 

 Because the trial court erred by failing to suppress the seven minute jailhouse conversation, we must reverse and order a new trial.
 

 Reversed and remanded.
 

 FARMER and HAZOURI, JJ., concur.
 

 [1]
 

 . The entire interrogation was digitally recorded by a hidden law enforcement camera. Throughout this opinion, references to times reflect the time of day indicated on the clock inside the interrogation room. This is provided for edification and context.
 

 [2]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
 

 [3]
 

 .During the hearing on the motion that led to the trial court's suppression order, Detective Bailante admitted that the decision by Detective Marks to remain in the interrogation room after Cox invoked his right to counsel was part of an overall interrogation technique. Detective Bailante testified, “Quite often, people will start to talk again.”
 

 [4]
 

 . These admissions by Cox were included in the trial court’s suppression order.
 

 [5]
 

 . At Dennis Cox’s trial, co-defendant Christopher McCall testified to the following:
 

 Defense counsel: They told you to go into the room, right?
 

 McCall: Yes, sir.
 

 [[Image here]]
 

 Defense counsel: You knew when you walked in there you needed to get information, correct?
 

 McCall: Yes, sir.
 

 [[Image here]]
 

 Defense counsel: So the more information you can get from Dennis Cox, was it your understanding that that would be more help from the police?
 

 McCall: Yes, sir.
 

 [6]
 

 . U.S. Const, amend. V; Art 1, § 9, Fla. Const.