DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MICHAEL MAROTTA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2023-0448

[July 31, 2024]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Martin S. Fein, Judge; L.T. Case No. 13015574CF10A.

Carey Haughwout, Public Defender, and Patrick B. Burke, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Heidi L. Bettendorf, Senior Assistant Attorney General, West Palm Beach, for appellee.

FORST, J.

Appellant Michael Marotta appeals his convictions and life sentences rendered after a jury found him guilty of first-degree murder, robbery, and burglary.

Marotta argues the trial court erred in denying his motion to suppress inculpatory statements which he had made to a co-defendant in a police station, because the police did not administer *Miranda*[1] warnings prior to Marotta's recorded conversation with the co-defendant.

We affirm the conviction and write to address one issue—whether Marotta's statements made to the co-defendant should have been suppressed because those statements were made prior to the administration of *Miranda*'s prophylactic warnings.

**Background**

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

An elderly husband and wife were found bound, gagged, and dead in their Broward County home. The wife was found with a bag over her head. The victims died of stab wounds and sharp forced injuries. Their jewelry was stolen.

Police arrested the co-defendant as a suspect and transported him to Broward County after DNA from blue painter's tape and rope from the crime scene matched his DNA.

## A. Circumstances Leading up to Marotta's Conversation with the Co-Defendant

The lead detective investigating the murders testified as follows. After the co-defendant's arrest, the co-defendant and the lead detective spoke in Broward County. The co-defendant told the lead detective he could get Marotta to confess if the detective placed the co-defendant in a room with Marotta. The co-defendant also told the lead detective, "we deserve the death penalty." The lead detective placed Marotta in a room with the co-defendant to confirm whether the co-defendant was telling him the truth, not necessarily to draw Marotta's confession. The co-defendant was the "architect" of this plan and the lead detective "allowed it to be done."

The co-defendant asked the lead detective for three things prior to speaking with Marotta: (1) to make sure Marotta went to jail; (2) to see his wife before he went to jail; and (3) to make sure his dog was not taken to a kill shelter. The lead detective agreed to these conditions.

The co-defendant then asked whether Marotta thought he was coming down for a visit or because he was under arrest. The lead detective responded, "I don't have a warrant for [Marotta] as of yet. Um, but based upon what you are telling me, he's not getting let loose because as soon as I'm done talking to him, either way I am going to call the state attorney and say this is what I have. I'm going to arrest [Marotta]. You know what I am saying?" After the co-defendant implicated Marotta, the lead detective said, "Okay. I understand that, man. Again, I don't know what he said already. He may have already told the story or he may not have already told a story. . . . I'm gonna put you and him together just like you said."

## B. Marotta's Pre-Miranda Conversation with the Co-Defendant

The lead detective placed Marotta in a room alone with the co-defendant. The lead detective testified he told Marotta that the co-defendant wanted to speak with him. Marotta had not received a *Miranda* warning at this point.

2

Marotta maintains he was unaware his conversation with the co-defendant was being recorded. During their talk, Marotta provided incriminating comments with regard to the double homicide, burglary, and robbery. When the co-defendant asked Marotta how deep he buried the stolen jewelry, Marotta said it was deep enough. At a later point, Marotta expressed worry over providing a DNA sample to police.

### C. *Marotta's Post-*Miranda *Statements and Confessions*

The lead detective subsequently entered the room and brought Marotta into a separate room without the co-defendant's presence. This exchange was also recorded. Marotta told the lead detective that he had no problem talking all night to police. After asking Marotta identifying and background information and about his relationship with the co-defendant, the lead detective read *Miranda* warnings to Marotta. Marotta did not invoke his *Miranda* rights. After being read his *Miranda* warnings, Marotta said he voluntarily went in to talk to the co-defendant. At this point in the interrogation, Marotta vacillated and shared differing stories and events that occurred on the day of the murders.

After claiming to have visited a friend on the day of the murder and not being in the condominium complex that day, Marotta eventually confessed to having played a role in the double-homicide, robbery, and burglary. After providing details of the victims' murders, Marotta declared: "I'm living with it for days. . . . I can't take this anymore."

### D. *The Trial Court's Denial of Marotta's Motion to Suppress*

Pre-trial, Marotta moved to suppress his statements made to detectives, contending those statements were the product of an illegal detention and coercion. The trial court denied the motion to suppress, determining in pertinent part: (1) the lead detective placed Marotta in the room with the co-defendant to determine whether the co-defendant's allegations were true; (2) "[Marotta] was not forced to go into the room with [the co-defendant]"; and (3) "[Marotta's] statement to [the co-defendant] was not obtained in violation of his *Miranda* rights notwithstanding [the co-defendant's] role as a state agent."

Based on its findings and legal analysis, the trial court held, "[a]lthough [the co-defendant] told [Marotta] that their conversation would not be recorded, nothing in the record indicates that this was done at [the lead detective's] behest." The court concluded, "[b]ecause [Marotta's] statement

3

to [the co-defendant] was not obtained in violation of his constitutional rights, his statement to [the lead detective] is also admissible."

### *E. Guilty Verdict*

The jury found Marotta guilty of two counts of first-degree murder, two counts of robbery, and one count of burglary. The trial court sentenced him to life in prison for the two murder convictions and up to fifteen years for each of the other crimes. This appeal follows.

## Analysis

Marotta argues the trial court erred in denying his motion to suppress because his pre-*Miranda* statements were illegally obtained. Specifically, he argues the police violated his Fifth Amendment privilege against self-incrimination because the police were required to have read him *Miranda* warnings *before* he was subject to custodial interrogation by the co-defendant with the lead detective's approval. Additionally, Marotta contends his post-*Miranda* confession made to police should have been suppressed because the police conducted a deliberate two-step interrogation. In response, the State argues the trial court properly denied Marotta's motion to suppress because Marotta was not subject to custodial interrogation.

### *A. Standard of Review*

"A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Cruz v. State*, 320 So. 3d 695, 712 (Fla. 2021) (quoting *Jackson v. State*, 18 So. 3d 1016, 1027 (Fla. 2009)). But we "independently review mixed questions of law and fact that ultimately determine constitutional issues." *Myers v. State*, 211 So. 3d 962, 973 (Fla. 2017) (quoting *Globe v. State*, 877 So. 2d 663, 668–69 (Fla. 2004)).

"[W]here a defendant is recorded either by audiotape or videotape, appellate review of the facts is aided in determining whether the trial court's findings are supported by competent, substantial evidence." *Id.* at 974.

### *B. Miranda*

4

The fundamental privilege against self-incrimination is protected under the Federal and Florida Constitutions. U.S. Const. amend. V; Fla. Const. art. I, § 9; *see Cox v. State*, 26 So. 3d 666, 674 (Fla. 4th DCA 2010). Under *Miranda*, defendants are entitled to prophylactic warnings before any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). *Miranda* warnings are designed to preserve the privilege against "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements." *Id.* at 445.

"The safeguards provided by *Miranda* apply only if an individual is in custody and subject to interrogation. Where either the custody *or* interrogation prong is absent, *Miranda* does not require warnings." *Gordon v. State*, 213 So. 3d 1050, 1052 (Fla. 4th DCA 2017) (emphasis added) (quoting *Timmons v. State*, 961 So. 2d 378, 379 (Fla. 4th DCA 2007)).

Our supreme court "has recognized, '[t]he protections enunciated in *Miranda* have been part of this State's jurisprudence for over a century pursuant to the Florida Constitution." *Myers*, 211 So. 3d at 969 (alteration in original) (quoting *Ramirez v. State*, 739 So. 2d 568, 573 (Fla. 1999)).

### C. Interrogation

"Interrogation occurs when a state agent asks questions or engages in actions that a reasonable person would conclude are intended to lead to an incriminating response." *State v. McAdams*, 193 So. 3d 824, 833 (Fla. 2016); *see also Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Miranda*, 384 U.S. at 478.

"[M]ost conversations and confessions in a police interrogation room are admissible as evidence" because "[i]t has long been held that inmates do not have a reasonable expectation of privacy in jail." *Cox*, 26 So. 3d at 676. Unless police provide specific or deliberate assurances of privacy, suspects generally have no expectation to privacy while in police custody. *See Davis v. State*, 121 So. 3d 462, 487 (Fla. 2013). "Courts have held confining a suspect to a holding cell does not subject the suspect to the functional equivalent of interrogation." *Gordon*, 213 So. 3d at 1053. "[I]n most cases, conversations between suspects and undercover agents do not

implicate the concerns which produced *Miranda*." *State v. Russell*, 814 So. 2d 483, 487 (Fla. 5th DCA 2002).

In *Illinois v. Perkins*, 496 U.S. 292 (1990), the U.S. Supreme Court upheld the admission of a "jailhouse confession" made to an undercover law enforcement agent posing as a cellmate and made clear that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Perkins*, 496 U.S. at 296. The court held:

> The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking.

*Id.*

"*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." *Id.* at 294.

"*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id.* at 297. Thus, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Id.*

The rationale underlying *Perkins* is "quite broad [and] applies not only to undercover police officers, but also to private citizens who act as agents of law enforcement." *Halm v. State*, 958 So. 2d 392, 395 (Fla. 2d DCA 2007). "Deception which takes advantage of a suspect's misplaced trust in a friend does not implicate the right against self-incrimination . . . ." *Alexander v. Connecticut*, 917 F.2d 747, 751 (2d Cir. 1990).

Here, Marotta had no reason to believe the co-defendant was acting on behalf of the police. Moreover, the police did not recruit and direct the co-defendant to be a false friend and coerce a confession out of Marotta. Rather, the co-defendant volunteered to speak with Marotta, who in turn, volunteered a confession.

6

Consequently, the co-defendant did not "interrogate" Marotta, nor did the dialogue amount to the "functional equivalent" of interrogation; rather, they shared a casual conversation. *See U.S. v. Thomas*, 381 F. App'x 495, 502 (6th Cir. 2010). Marotta did not confess in a "police-dominated atmosphere," and thus, did not implicate the concerns underlying *Miranda* when he spoke with the co-defendant. Marotta's confession is admissible because he did not have a reasonable expectation of privacy in the police interview room with the co-defendant, as the police did not actively assure him of privacy.[2]

### Conclusion

The trial court did not abuse its discretion in denying Marotta's motion to suppress his pre-*Miranda* statements made to the co-defendant as their discussion was not a "custodial interrogation."

*Affirmed.*

KLINGENSMITH, C.J., and GROSS, J., concur.

*          *          *

***Not final until disposition of timely filed motion for rehearing.***

---

[2] Marotta's dialogue with Co-Defendant is akin to situations in which a co-defendant or false friend agrees with police to make a controlled call to a defendant. Such controlled calls may be employed to obtain incriminating responses from the defendant. *See Brooks v. State*, 267 So. 3d 417, 419–21 (Fla. 4th DCA 2019); *Nunn v. State*, 121 So. 3d 566, 567–68 (Fla. 4th DCA 2013).