PER CURIAM.
Ralston Davis was charged by indictment in Broward County with three counts of first-degree murder arising from the December 2, 2005 shooting deaths of Myo-sha Proby, Ravindra Basdeo, and Carlos Jones. Davis entered a plea of not guilty by reason of insanity. The jury rejected Davis’s insanity defense and convicted him of each count of first-degree murder. At the end of the penalty phase, the jury recommended life imprisonment for the murders of Basdeo and Jones, but recommended death for the murder of Proby by a vote of eight to four. The trial court followed the jury’s recommendations, imposing two sentences of life imprisonment and one sentence of death.
Davis now appeals his convictions and sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm the convictions for first-degree murder and sentences of life imprisonment, but find that the sentence of death is disproportionate. Accordingly, we vacate the death sentence and remand the case to the trial court for imposition of an additional sentence of life in prison.
I. STATEMENT OF THE CASE AND FACTS
A. The Guilt Phase
The evidence presented at trial established that on the evening of Friday, De *468 cember 2, 2005, between 10:30 p.m. and 11:00 p.m., appellant Ralston Davis engaged in a violent rampage with an AR-15 semiautomatic assault rifle. According to the State’s evidence, Davis first went to the home of his friend, Myosha Proby, and shot her to death. Davis then drove to a nearby gas station, where he killed Ravin-dra Basdeo and Carlos Jones, seemingly at random. The defense did not dispute that Davis committed the murders, but presented expert witnesses and other evidence to establish that at the time of the offenses, Davis was suffering from a brief psychotic disorder and was legally insane.
1. The State’s Evidence
As background, the State presented the testimony of Randy Reddick, Jr. Reddick testified that he was a gun collector and that the rifle used by Davis oxiginally belonged to him. Reddick stated that on November 30, 2005, he and Davis were both at a mutual friend’s house when he mentioned to Davis that he was planning to sell the rifle. Davis asked to see the rifle, Reddick showed it to him, and Davis offered to buy it. Reddick said that when he sold Davis the rifle, Davis was “[h]is normal calm, cool, collected self.” Reddick testified that at that time he had known Davis for three years, that they had previously visited a shooting range together, that Davis was always a polite and respectful person, and that he saw no problem with selling him the rifle.
The first reported incident on the evening of December 2 occurred shortly after 10:30 p.m. Jerry Nicholson testified that he was working as a chef at a barbecue stand on the corner of Northwest 31st Street and Sunrise Boulevard in Ft. Laud-erdale, when he saw a car stop at a green light in the middle of the intersection, blocking traffic. A man got out of the car, jumped on top of the car’s hood, and began firing a gun into the air. The incident was reported in a call to 9-1-1 at 10:35 p.m. Nicholson could not identify the car or the shooter, but shell casings that were later recovered from the intersection were identified as having been fired from Davis’s gun.
Shortly after the reported incident at the intersection, Davis arrived at the apartment of Myosha Proby. Hermione Harrell testified that she was at Proby’s apartment in Lauderhill on the evening of December 2. Harrell said that she had gone out with Davis several months before, but that she had decided not to continue dating him and that she introduced Proby to Davis. Harrell testified that on December 2, she and Proby ate dinner and watched a movie. Harrell stated that she was getting ready to go out with friends later in the evening. Proby asked to use Harrell’s phone, while Harrell took a shower. When Harrell got out of the shower, Proby looked upset. Proby said that she had called Davis and that he sounded irate about something. Proby called Davis back. When Davis answered, Harrell could hear him yelling through the phone and heard him say the words, “come out.” Proby told Harrell, “[Hje’s going to come kill me.” Harrell responded that Proby should call the police. Harrell also tried to call Davis’s phone again. When Davis did not answer, Harrell sent him a text message that said, “Sorry for disturbing you, this is your homegirl Tish, call me when you get this message.” Harrell testified that Davis knocked on the door of the apartment several minutes later and that Proby let him in.
Jason Rolle testified that he was walking up the stairs to his cousin’s second floor apartment when he saw Davis park his car in front of the apartment building. Davis left the car door open with the ignition running, and music was blaring loudly from the car. Rolle testified that Davis *469 began walking up the stairs behind him. Davis was carrying a gun, was bleeding from his mouth and nose, and looked as if he had just been in a fight. Rolle stated that Davis “had a serious face, like he was in the Army or something” and that Davis looked “pissed off.” Davis walked past Rolle at the top of the stairs and banged his fist on the door of an apartment located across the hall from the apartment of Rolle’s cousin. When Rolle saw Davis cock the gun, Rolle walked back down the stairs, called his cousin, and told him not to open his apartment door. Rolle heard gunshots soon after.
Harrell testified that when Proby let Davis into the apartment, he began yelling, ‘You set me up, you set me up.” Harrell recalled Proby saying, “That wasn’t my brother,” and that Davis responded, “I know.” However, Davis continued yelling, “You set me up, you set me up.” Harrell said that Davis had a slight stagger, seemed unsteady on his feet, had bloodshot eyes, and that he appeared to be “on something.” Harrell said she had “never seen him like that.” ’When Davis entered the apartment, he went directly to Proby and paid no attention to Harrell. After repeatedly telling Proby, “I know it’s not your brother,” Davis told Proby to “Get the ‘F’ down.” Harrell testified that Pro-by got on her knees with her back to Davis, folded her arms, and that Davis “just started shooting her.” Davis walked around the coffee table and continued shooting Proby, then stood on top of the coffee table while continuing to fire down at her. Harrell testified that she ran, opened a sliding glass door which led onto the balcony, jumped to the ground from the second floor and ran into a wall, fracturing her ribs, wrist, and ankle. Harrell hid in a laundry room until she heard emergency sirens.
After leaving Proby’s apartment, Davis drove back toward the intersection of Northwest 31st Street and Sunrise Boulevard. Jerry Nicholson testified that twenty or thirty minutes after observing Davis fire into the air at that intersection, a car pulled into the parking lot of the Exxon gas station where Nicholson’s barbecue stand was located. Witnesses testified that at that time, several dozen people were standing at or around the barbecue stand. Nicholson saw Davis get out of his car with a rifle. Farrah Cyprien, Nicholson’s sister, saw Davis tapping on the window of another car, and heard him say to the driver, ‘You don’t know me, you don’t know me.” Christian Gaines and Ebony Deadwyler were also in the parking lot of the Exxon station. Gaines observed a silver Chevy Lumina pull into the parking lot, playing music loudly. Gaines saw Davis get out of the silver car and walk to another car nearby. Gaines heard what sounded like an argument, followed by a muffled pop sound. Deadwyler had a clearer view of the events. She saw Davis pull into the gas station, jump out of his car and walk up to another car. Deadwyler testified, “I heard him yelling and cursing, and he just shot the guy.” The victim was later identified as Ravindra Basdeo.
John Diggs was also sitting in his car in the parking lot of the Exxon station, and observed Basdeo’s shooting. Diggs said that everyone in the parking lot scattered, while he tried to lean his seat back so that Davis would not see him. However, Davis noticed Diggs and started walking toward Diggs’ ear. According to Diggs, Davis said something indicating that Basdeo had done something to offend him. At that point, another man, Carlos Jones, walked out of the gas station. Diggs saw Davis grab Jones, putting his arm around Jones’s neck and shoulder. Davis then told Jones, “Get on the ground or I’m going to kill you.” Jones got on his knees *470 and Davis immediately shot him. Davis returned to his car and drove out of the gas station. Gaines and Deadwyler also observed the second shooting. They said that Davis drove out of the gas station just as the police were driving in.
Detective Kerri Hagerty testified that she was on road patrol with her partner, Detective Jeffrey Jenkins, when they received a dispatch at 10:51 p.m. reporting that a black male in a Chevy Lumina was waving an assault rifle out of his car window. As they approached the intersection of 31st and Sunrise, they saw Davis leaning out of the window of the silver Lumina. They pursued the Lumina until it turned into the parking lot of a strip mall. Davis got out of the Lumina and the officers got out of their car. Jenkins observed that Davis was bleeding from the mouth. Hag-erty testified that Davis did not appear to be holding a gun when he got out of the car, but that she and Detective Jenkins drew their guns and ordered him to get on the ground. Davis yelled back at them, “I ain’t got my f* * :|!ing diamond earrings on.” Hagerty said that she was wearing diamond stud earrings at the time, but agreed on cross-examination that it was “a pretty disjointed statement under the circumstances.” Davis jumped back in his car and drove out of the parking lot, narrowly avoiding Hagerty and Jenkins. Hagerty and Jenkins returned to their car and again pursued Davis as he ran through a red light, drove over a sidewalk, wove in and out of traffic, and ran several cars off the road.
At the intersection of Sunrise Boulevard and the Florida Turnpike, Davis stopped his car suddenly, threw his keys out of the window, opened the door, and “just sat there.” Davis began to struggle as Detective Jenkins pulled him from the car. Hagerty and Jenkins attempted to restrain Davis as other officers arrived on the scene. Hagerty said that Davis was very angry, combative, and violent, and that he was cursing and spitting blood as the officers attempted to restrain him. Officer Adam Willson was following Jenkins and Hagerty as they pursued Davis, and assisted them in pulling Davis from the car. Willson testified that Davis was screaming, flailing, and kicking, and appeared extremely angry. Davis was placed in handcuffs but continued flailing. Willson then used a taser to incapacitate Davis. He said that Davis would calm down as each two-to-three second shock was administered, but that Davis would continue flailing and screaming again once the shock ended. Willson said that Davis was laughing as he struggled, and yelled, “Jesus is great” numerous times. Davis was placed in a police car, but started screaming again and kicking the windows. Officer Michael Connor testified that even after Davis was restrained, he continued rambling and saying things with religious overtones, including that Jesus would forgive him. Officer Michael Bigwood said that Davis’s behavior was “erratic and all over the place.” He said that Davis would change from second to second, “go[ing] from being somewhat compliant and quiet, to yelling, to kicking, to spitting, to back to quiet.” The officers testified that Davis eventually calmed down completely.
Detective Joseph Carmody testified that after Davis was restrained, a man identifying himself as Ralston Davis, Sr., Davis’s father, arrived at the scene. Detective Carmody told Mr. Davis that his son had to be taken to the hospital, but promised that he would call him when they arrived at the sheriffs office. Davis was transported to the hospital at 1:08 a.m. He allowed a doctor to clean his wounds and agreed to a CAT scan, but would not agree to stitches, antibiotics, a blood draw, or *471 anything involving a needle.[1] Detective Carmody remained with Davis at the hospital for two hours. He said that Davis seemed normal and did not appear to be hallucinating.
Davis was taken to the Broward County Sheriffs Office at 3:41 a.m. Homicide Detective Frank Ilarraza testified that when he learned Davis was going to be transferred to the sheriffs office, he set up a video camera in an interrogation room. Ilarraza turned on the camera at 3:55 a.m., and turned it off approximately five hours later at around 9:00 a.m. An edited DVD of the recording was submitted into evidence at trial and was played for the jury. Davis appears disoriented in the video, and much of his speech is transcribed as “unintelligible” in the official trial transcript.
At the beginning of the video, Davis is seen in the interview room with Detective Carmody. Davis was brought a change of clothes and the clothes he wore at the time of the offenses were collected. Davis mentioned that he was in ROTC and that his father was in the Army. He said to Detective Carmody, “I almost went into the Army. I don’t think it was meant to be though. I was meant to fight this war.” When Detective Carmody removed Davis’s handcuffs, Carmody commented, “Bad day, right?” Davis responded, “It’s been a good day.” Detectives Carmody and Ilar-raza also collected biographical information from Davis. Davis said that he was twenty-one years old, that his family was Jamaican, and that he graduated from Piper High School in 2003.
Davis’s parents entered the interrogation room at approximately 6:18 a.m. Davis’s mother asked Davis if he knew who they were. He identified his mother as “mom,” but said that his father was “the king.” They asked Davis what happened to his face and said that Davis needed medical treatment. Davis responded that he was alright. Davis’s parents asked him to tell them what happened. Davis said, “God put me out there to subtract somebody.” He continued, “Big sister ..., she betray me, so I murdered her.” He also said, “I was just on a mission, just taking care of business.” They again asked what happened to Davis’s face, and Davis responded that he was fighting with “[sjome dudes.” Mr. Davis asked about the people Davis was fighting.
MR. DAVIS, SR.: What you have to fight about?
RALSTON DAVIS: For my thrown [sic]. Tell (unintelligible) move to the side, I’m going to get mine.
MR. DAVIS, SR.: Move to the side where?
RALSTON DAVIS: Get out the way, it’s my time now, N-O-W, move to the side, time for the young man to take it over and run the whole city.
MRS. DAVIS: Run the whole city?
RALSTON DAVIS: Run the whole city, live like a king forevermore, walking the path of righteousness.
Davis mentioned his assault rifle and Mr. Davis asked why he had a gun. Davis responded, “Because me rod and me staff comfort me, that’s why it’s used.”
Davis’s parents asked about the people Davis killed. Davis said that his “big sister” was Bahamian. Mr. Davis asked Davis why he killed her. Davis said, “She pretend — she come into my life like my big sister (unintelligible), a sister real close to me. She was born the day before my birthday.” Davis’s parents replied that *472 Davis had real sisters and that they were worried about him. Davis said, “I’m all right, I’ll get a new one, I feel like I done my job, mission complete, and if there’s some more to go, pass me the AR-15.”
Davis’s father responded, “Let me get back to this big sister thing, we want to understand.” Davis said that she was “phony.”
RALSTON DAVIS: She said she was my big sister, she claimed to be my big sister, oh (unintelligible), this, that, and the other. She take me and like (unintelligible), call me bro, me start calling her big sis, she said (unintelligible) like a brother, she act like I’m like her brother (unintelligible), I ain’t real, he gangster. I really recommend (unintelligible).
MRS. DAVIS: She don’t have a little brother?
RALSTON DAVIS: (Unintelligible). The one who beat me.
MRS. DAVIS: Her brother beat you?
RALSTON DAVIS: (Unintelligible). The same, you know, the same people me end up fight (unintelligible). I park across the street and (unintelligible), I park across the street, I watched them, and the AR-15 comes out, four of them, four. (Unintelligible) send them across the street—
MR. DAVIS, SR.: What street?
RALSTON DAVIS: — while me watch, straight across the street. By Sunrise Boulevard. (Unintelligible). That’s the test, them OG’s, they done walked up and walked down the road already. They beat me up, but it’s all good, I feel that love, I feel the love, love, one love; black, white, Arab, Chinese, Indian, Jamaican, Haitian.
Davis’s mother said that she loved him, but that she did not support what he did.
The conversation continued:
RALSTON DAVIS: How about the Arab man?
MRS. DAVIS: The Arab man?
RALSTON DAVIS: Like Indian boy, or whatever him is.
MRS. DAVIS: I don’t know about him. You didn’t tell me about him.
RALSTON DAVIS: I follow my instinct, and he disrespect me, I swerved on 31st.
MRS. DAVIS: Yeah.
RALSTON DAVIS: Before we get behind the king, when me cut across the lane, boy disrespect me and go around me.
MRS. DAVIS: Oh yeah?
MR. DAVIS, SR.: But since when do you go—
RALSTON DAVIS: So me follow him in a gas station, me make him open his mouth.
MRS. DAVIS: Oh yeah?
RALSTON DAVIS: And then (unintelligible) people at the barbecue, barbecue shopping, and I dump in they mouth, and everyone that shot not living anymore. I murdered his ass cause he tried me. I be a snake out there, pure snake.
Shortly afterward, Detective Carmody entered the room and informed Davis’s parents that they would have to leave. Davis’s mother told Davis that they would pray for him. Davis replied, ‘Yeah, pray for me. Tell — tell—tell the man I did my mission, and if he got more missions for me to do, I’m ready, it’s my time.” The video concluded after several officers arrived to take Davis to jail.
At trial, several witnesses for the State testified concerning the documentation of evidence. Shell casings recovered from all locations matched Davis’s rifle. The State also presented the testimony of Dr. Rein-hard Motte, the medical examiner who *473 conducted the victims’ autopsies. Motte testified that there were twenty-three entrance gunshot wounds on Myosha Proby’s head, back, and buttocks. Motte concluded that a single gunshot to the head was most likely the first shot fired and would have killed Proby instantly. He said that the angle of the entrance wounds indicated that Proby fell down onto the floor after being shot in the head, and that the other wounds were inflicted subsequently. Motte’s examination of Ravindra Basdeo indicated that Basdeo was shot once while seated in his car and that the gun was fired from inside Basdeo’s mouth. Motte testified that Basdeo would have died instantly. Motte found that Carlos Jones was shot four times, once each in the head, the right arm, the left side of the back, and the right shoulder. Motte determined that Jones’ head wound was inflicted at close range and would have been fatal; although, Motte could not determine the order in which the wounds were inflicted.
2. The Defense’s Evidence
Defense counsel did not dispute the essential facts of the case, but sought to establish that at the time of the offenses, Davis was suffering from a temporary psychotic disorder and was legally insane. In support of this argument, the defense presented three mental health experts: Dr. Allan Ribbler, Dr. Abbey Strauss, and Dr. Dennis Day. Each expert testified to his belief that Davis was suffering from a stress-induced psychotic disorder at the time of the murders. In addition, the defense presented witnesses establishing Davis’s unusual behavior in the period leading up to and following the murders.
The defense’s first witness was Davis’s mother, Marcia Davis. Mrs. Davis testi-fled that Davis is one of six children, that she and her husband are both ministers, and that the family is very religious. She testified that Davis first started behaving uncharacteristically withdrawn around November 2005. On Wednesday, November 30, Davis got into a fight with his father, who threw him out of the house. When Davis had not returned by 3:00 a.m., Mrs. Davis called Davis and told him to come home. She found him asleep at the kitchen table the next morning at 6:00 a.m. He then went to bed fully dressed. Mrs. Davis testified that when Davis got up approximately three hours later, wearing the same clothes, he seemed energetic and excited, and told her that he wanted to be a “singer for God.” He also asked her, “How do you know when God is talking to you?” Mrs. Davis asked if he thought God was talking to him. Davis replied, “Yes,” but would not say anything else.[2] Later in the day, Davis told his mother that he had met a girl who would be his “big sister.” He said that he had known her for several weeks, and that if his father kicked him out he could come live with her. Mrs. Davis left for an appointment and did not see Davis again until Friday.
Mrs. Davis testified that on Friday morning, Davis was wearing the same clothes he had been wearing since Wednesday. He gave his mother roses and told her that he wanted to be involved in her church. Davis’s phone rang and he answered it. After getting off of the phone, he said that the girl he talked about before had invited him to breakfast. Mrs. Davis said that Davis was fidgeting and constantly looking behind him. She asked if he was on drugs, and he said he was not. Mrs. Davis saw Davis again later that *474 evening. Davis went to his parents and said that his father was “the king.” Mr. and Mrs. Davis began to talk to him, but Davis’s phone rang and he left the house.
Later that night, some people came to the door and told Davis’s parents that they had seen Davis surrounded by policemen near the Florida Turnpike. Mrs. Davis drove there with her husband and saw Davis on the ground, restrained by several officers. She and her husband spoke to one of the officers and later visited Davis at the police station. She said that when they arrived, Davis seemed disoriented. Mrs. Davis asked Davis whether he recognized them, because when they entered the room he did not seem to know who they were.
The defense also presented several witnesses who described Davis’s behavior following the shootings. Victoria Oldag was an emergency medical technician at the Broward County Jail. Oldag evaluated Davis when he was brought to the jail on December 3, the morning after his arrest. Davis was talking to himself, giggling, and would not make eye contact. At times he would stare off into space. Oldag wrote, “violent, unable to sign,” on Davis’s medical intake form, and checked boxes for “hallucinations” and “bizarre behavior.”
Curtis White testified that he was a correctional deputy at the jail. White testified that Davis was “totally rowdy” when he was brought in and that Davis was kicking and yelling. White could not understand many of the things Davis was saying. Davis would talk to himself and recite scripture. Davis remained at White’s unit for approximately one week. White said that Davis’s behavior slowly improved over that time, but Davis was still acting bizarrely and made comments about God talking to him.
Dorothy Ferraro testified that she was an assistant public defender in Broward County. She went to see Davis on the week of December 20, 2005. When Ferraro was brought to Davis’s holding cell, Davis was jumping up and down and yelling gibberish. Ferraro felt that Davis was mentally unstable, and based on that meeting had him evaluated for competency to stand trial.
The defense’s three mental health experts — Dr. Ribbler, Dr. Strauss, and Dr. Day — testified that Davis was suffering from a brief psychotic disorder and was legally insane. Dr. Ribbler testified that under the DSM-IV manual, a brief psychotic disorder requires the presence of one of four symptoms: delusions, hallucinations, disorganized speech, or grossly disorganized or catatonic behavior. In Davis’s case, Dr. Ribbler found that Davis exhibited both hallucinations and delusions, manifested as the voice of God speaking to him. According to Dr. Rib-bler, brief psychotic disorders are stress-induced and, while rare, typically occur in individuals in their late-teens to early-twenties.
Each expert interviewed Davis several times and essentially learned the same information. A short time before the offenses, Davis had been a witness for the prosecution in a murder trial concerning a stabbing at Piper High School. The trial arose out of an incident where one of Davis’s friends was assaulted and stabbed to death in Davis’s presence. Davis attempted to perform CPR, but the friend died in his lap. Dr. Strauss found that Davis was extremely stressed following the trial because he was afraid that he was not a strong enough witness.
On the evening of Wednesday, November 30, 2005, Davis had a fight with his father, who threw him out of the house. Davis reported that he spent that night in his car and awoke the next morning with a *475 euphoric feeling. That day, Davis came to believe that he had been chosen by God to fulfill a mission. Davis spent the day being charitable to people, visited a friend in the hospital, and forgave his father for their fight. In addition, a man approached Davis on the street and began speaking to him about the Bible and King Solomon, which Davis felt was not a coincidence. On Friday morning, Davis received a call from Myosha Proby, who invited him to breakfast. However, Davis’s mother convinced him not to go because he did not know Proby very well.
On Friday evening, Davis went to a music studio with friends, where they smoked marijuana. Davis returned to the studio alone later in the evening. Davis reported that he was talking on his phone and a group of men told him to be quiet. This resulted in an altercation; the men threw Davis out of the studio and beat him up. One of the men threatened Davis with a gun, causing Davis to go to his car and retrieve his rifle. At that point, Davis received a call from Proby. He came to believe that the call was not a coincidence, and that his “mission” was to kill her. Davis went to Proby’s apartment and shot her to death. As Davis was driving away from Proby’s apartment, another car swerved around Davis’s car on the road. Davis took this as a sign of disrespect for God and concluded that the driver was evil. Davis then followed the car into a gas station and shot the driver, Ravindra Basdeo. Davis could not explain what caused him to kill Carlos Jones.
Dr. Strauss testified that the video recording of Davis’s conversation with his parents supported a conclusion that Davis was psychotic. Davis was able to speak with his parents in a safe environment and seemed committed to the idea that he had completed a mission. Although Davis appeared calm in the video, Dr. Strauss noted that psychoses fluctuate and that individuals with psychotic disorders can have periods of greater and lesser lucidity. Dr. Strauss testified that his conclusions were further supported by medical records from Davis’s time at the Broward County Jail. On a medical intake form dated December 3, the evaluator concluded that Davis should be placed under psychological observation. On December 6, the reviewing physician wrote that Davis exhibited bizarre behavior and “remain[ed] psychotic.” Davis continued to exhibit symptoms of psychosis, and was eventually placed on Risperdal, an antipsychotic. The medication was not discontinued until March 13. Dr. Strauss found this timeline consistent with his diagnosis of a brief psychotic disorder, which generally remits within one to two months, but may sometimes last longer.
On cross-examination, Dr. Strauss agreed that behavior similar to psychosis can be caused by cocaine use. However, Dr. Strauss explained that he ruled out drugs as a cause of Davis’s behavior. Dr. Strauss noted that cocaine-induced psychoses are extremely rare. Further, while cocaine leaves a person’s system within four to five hours, Davis was found incompetent to stand trial on January 26, 2006. Dr. Strauss also noted that Davis remained on Risperdal until March 13, indicating that there was a clinical need for it.
The defense’s final mental health expert, Dr. Day, agreed with Dr. Strauss that the time frame surrounding Davis’s symptoms was inconsistent with a drug-induced psychosis. Dr. Day stated that while there was no evidence Davis had used cocaine, there was significant evidence that Davis had suffered several major stressors in the period leading up to the offenses. Dr. Day noted that Davis had been a witness in a murder trial, which caused him to feel a tremendous amount of fear and paranoia. *476 Davis came to believe that there was a curse on him or that an evil power was trying to hurt him. Dr. Day thought getting kicked out of his house may have been “the final straw that broke the camel’s back.” Dr. Day noted that Davis had no history of mental illness, so the episode appeared to be a brief psychotic disorder. All three mental health experts testified that they believed Davis was legally insane at the time of the murders.
3. The State’s Rebuttal
In rebuttal, the State presented the testimony of psychologist Dr. Lori Butts. In contrast to the defense’s experts, Dr. Butts concluded that Davis was not insane. Dr. Butts found several sources of information that indicated Davis was malingering, including jail medical records, notes by Davis’s girlfriend, a competency evaluation by Dr. Trudy Block-Garfield, and psychological testing conducted by Dr. Bran-non. With regard to the jail records, Dr. Butts concluded Davis’s reported symptoms were exaggerated and were inconsistent with real mental illness. Dr. Butts also stated that she had reviewed a diary written by Davis’s girlfriend. In the diary, Davis’s girlfriend wrote that she heard Davis’s mother tell Davis that he should convince authorities that he was “crazy.” In addition, Dr. Butts cited a mental health evaluation conducted in April 2006, in which a psychiatrist concluded that Davis was malingering.
Dr. Butts believed that Davis was not suffering from a stress-induced psychosis, but rather that he was under the influence of drugs at the time of the murders. She found that Davis’s behavior could have been consistent with the use of cocaine, ecstasy, or amphetamines. Other information indicated that Davis may have been using drugs. Davis had admitted using marijuana, which Dr. Butts testified could have been laced. Hermione Harrell reported that she knew Davis used ecstasy, and Davis’s girlfriend wrote that he went to get pills on the day of the murders. Additionally, Davis was known to sell drugs, and crack cocaine was found in his car following his arrest. Dr. Butts also observed that Davis’s behavior fluctuated in the period leading up to the shootings, from peaceful in the morning to violent in the evening. Dr. Butts testified that taking all data into account, she believed the most likely explanation for Davis’s behavior was that he was using substances. Dr. Butts concluded that Davis’s behavior indicated that even if he was mentally ill, he knew that his actions were wrong.
Following Dr. Butts’ testimony, the State rested. The jury subsequently convicted Davis of all three counts of first-degree murder.
B. The Penalty Phase
At the penalty phase, the State largely relied on the evidence presented during the guilt phase. However, the State introduced photographs of Myosha Proby and Ravindra Basdeo, as well as victim impact statements by Tabitha James, the sister of Myosha Proby, Sandra Basdeo, the sister of Ravindra Basdeo, and Elsa Jones, the mother of Carlos Jones. After the reading of the victim impact statements, the State rested.
Marcia Davis, the defendant’s mother, testified again at the penalty phase. Mrs. Davis said that she moved to New York City from Jamaica in 1982. In New York, she met Ralston Davis, Sr., the defendant’s father, who was also from Jamaica. Ral-ston Davis, Jr., the defendant, was their first child. Due to financial problems, they decided to move the family to Ft. Lauderdale, Florida when Ralston was five years old. Mrs. Davis brought Ralston and his two younger sisters to live with one of her cousins in Jamaica, while she *477 and Mr. Davis established themselves in Florida. The children remained in Jamaica for approximately one year. Mrs. Davis learned from a friend that the children were not being fed, were essentially being left to take care of themselves, and that Ralston was being beaten. She was told about an incident where Ralston ran away and was eventually discovered under a house, where he had been hiding for two or three days. Mrs. Davis went to Jamaica and brought the children to live with her husband’s family. However, Mrs. Davis later learned that the children were being treated the same way. The children were not being fed or cared for and were being forced to sleep on the floor. She also learned that the children were largely being left in the care of an ex-girlfriend of Mr. Davis, who was beating Ralston.
Mr. and Mrs. Davis moved the children to Florida when Ralston was six years old. Mrs. Davis said that Ralston was picked on in school because of his Jamaican accent. When he was eight years old, he once came home with a broken nose and a missing tooth. Mrs. Davis said that Ral-ston was a kind and loving child and that he did not like to fight. She said that the family owned a grocery store and restaurant in Miami. The business was robbed in 1992, which destroyed the family financially. At that point, the children were taken back to Jamaica to live with another cousin. However, Mrs. Davis learned that the children again were not being taken care of and were being beaten. She said that Ralston still has a scar on his upper arm from being whipped.
Mrs. Davis and her husband were not able to support themselves in Florida, so they decided to move back to Jamaica. They and their six children moved into a two bedroom shack with no running water. Mrs. Davis eventually decided to return to Florida to find a job, while the family remained in Jamaica. While the children were with their father, she learned that Ralston was being molested by a preacher’s assistant. At this point, Ralston was twelve or thirteen years old. Mrs. Davis decided to send Ralston to live with his paternal grandmother in New York when he was fourteen or fifteen. However, Ral-ston did not have a good relationship with his grandmother, who would sometimes not feed him and at one point kicked him out of her house.
Eventually, Mrs. Davis brought all of the children back to Florida. When Ral-ston was in high school and close to graduation, he came home and told her that one of his friends had died. Ralston said that his friend had been stabbed and that he tried to resuscitate him and bring him to the hospital, but that the friend died in his arms. Mrs. Davis said that prior to that incident Ralston was always outgoing and would bring friends over to their house. After his friend’s death, Ralston became much more withdrawn. She said that he was especially upset around the time of the trial on the stabbing because he believed that the other boys involved in the incident were lying about what happened. Mrs. Davis said that when she saw Ralston after the shootings on December 2, 2005, he looked like a different person. She said that she should have taken Ralston to see a doctor when he began acting strangely the preceding Wednesday.
Ralston Davis’s younger sister, Ruth Davis, testified about the children’s experience in Jamaica when she was three years old and Ralston was five. She said that they were not fed and that the people they were living with would beat Ralston with a switch. Later, when they lived in Florida, Ralston was picked on and beaten by other children because of his accent. She recalled one incident when he came home with his nose bloodied and a tooth missing. *478 On another occasion, several other children broke his arm. Ruth testified that Ralston was always a loving and kind person, that he was very outgoing, and that he considered everyone he met to be his friend. She testified that he was behaving very abnormally in the days leading up to the shootings.
Marjorie Morrison-Smith testified that she was a friend of the Davis family and had known Ralston for ten years. She testified that Ralston was always a kind, sweet, loving kid, that he was very reliable, and that she could always call him if she needed help with something. Daren Davis testified that he was Ralston’s younger brother. He testified that Ralston was a good brother. Ralston encouraged him to go to school and stay out of trouble, and once paid the fees for him to play little league football. Kerron Matthew testified that he and Ralston were friends in high school. Matthew testified that whenever he did not have money for lunch, Ralston would split his food or give him money. He said that Ralston was never violent and tried to stay out of trouble. Pamela Richardson testified that she was friends with Ralston and his mother. She said that Ralston was always a good person to her and that she could always call him if she needed anything. Charesse Sanford testified that she had known Ralston for six years and that he was the father of her son, who was three years old. She testified that Ralston was never violent with her and that she brings their son to see him often. Ralston Davis also testified, describing the events leading up to the murders. Davis said that the person who committed the murders was not him and that he felt horrible about what happened.
As its final witness, the defense presented Dr. Michael Brannon, a psychologist. Dr. Brannon testified that he was initially retained in 2006 to evaluate Davis’s competency to proceed. In January 2006, Dr. Brannon administered a test for malingering and the results indicated that Davis was not faking. Davis scored highly on testing for paranoia, and his scores were similar to those of individuals suffering from paranoid delusions. Dr. Brannon also reviewed documentation of the offenses and Davis’s family history, and met with Davis approximately ten times. Dr. Brannon found that Davis’s childhood was chaotic, that he had moved frequently, and that he suffered significant physical abuse as well as sexual abuse. Despite Davis’s childhood, Dr. Brannon found that Davis did not show any characteristics of having a psychopathic personality. Dr. Brannon stated that in more recent testing, Davis no longer scored highly for paranoid delusions and his scores were in the normal range.
Dr. Brannon concluded that Davis was suffering from a brief psychotic reaction at the time of the offenses. He believed that based on Davis’s history, “he was predisposed to have some mental health issues under undue stress or pressure.” Dr. Brannon found that the period before the murders was particularly stressful based on a number of factors, including the death of Davis’s friend, the fact that his father had thrown him out, and that his girlfriend was pregnant. Dr. Brannon concluded that Davis was under the influence of extreme mental or emotional disturbance, acted under extreme duress, and was substantially impaired in his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
At the end of the penalty phase, the jury recommended a sentence of death for the murder of Proby by a vote of eight to four. The jury recommended life imprisomnent for the murders of Basdeo and Jones.
*479 C. The Spencer Hearing
The trial court held a Spencer[3] hearing on September 10, 2009. The defense first presented Dr. Lori Butts, who testified on behalf of the State during the guilt phase. At the Spencer hearing Dr. Butts testified that Davis’s behavior at the time of the offenses was inconsistent with his behavior both before and after the incident. While she could not rule out the possibility that Davis was suffering from an organic psychotic disorder, she believed it was more likely that Davis was suffering from a substance-induced psychosis at the time of the offenses. Regardless, Dr. Butts believed that Davis was suffering from some type of psychosis and that his ability to make decisions was impaired.
The defense next presented Dr. Alan Ribbler. Dr. Ribbler reaffirmed his belief that Davis was insane at the time of the offense. Dr. Ribbler also testified that he believed Davis’s capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired. The defense’s third witness was forensic psychologist Dr. Michael Brannon. Dr. Brannon testified that Davis was under the influence of extreme mental or emotional disturbance at the time of the offense, and that Davis’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. The defense’s fourth witness was Dr. Abbey Strauss. Dr. Strauss reaffirmed his position that Davis was legally insane at the time of the crimes, and testified that he believed both statutory mental health mitigators were met as to the murder of Myosha Proby. Finally, the defense presented Dr. Dennis Day, who also reaffirmed his conclusion that Davis was legally insane at the time of the crimes, and testified that he believed both statutory mental health mitigators applied.
D. Sentencing
The trial court issued its sentencing order on January 7, 2010. As to the murders of Ravindra Basdeo and Carlos Jones, the trial court followed the jury’s recommendations and imposed two sentences of life imprisonment. As to the murder of Myosha Proby, the trial court found and assigned weight to the following aggravating circumstances: (1) Davis was contemporaneously convicted of another capital felony (i.e., the contemporaneous murders of Basdeo and Jones) (great weight); (2) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); and (4) the crime was committed in the course of a burglary (slight weight).
The trial court further found and assigned weight to the following statutory mitigating circumstances: (1) Davis has no significant history of prior criminal activity (little weight); (2) the crime was committed while Davis was under the influence of extreme mental or emotional disturbance (moderate weight); (3) Davis’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (moderate weight); (4) Davis’s age (twenty-one) at the time of the crime (slight weight). The trial court also found ten nonstatutory mitigating circumstances, which it assigned little or slight weight.[4] *480 The court concluded that the aggravating circumstances outweighed the mitigating circumstances, and imposed a sentence of death.
II. ANALYSIS
A. Guilt Phase Issues
Davis raises the following challenges on appeal pertaining to the guilt phase of his trial: (1) the trial court erred in allowing Hermione Harrell to testify over a hearsay objection that Myosha Proby said to her, “He’s going to come kill me”; (2) reversible error occurred when the jury viewed a DVD on which Davis invoked his right to remain silent; (3) the trial court erred in denying the motion to suppress the DVD of Davis and his parents; (4) the trial court erred in allowing the jury to view a state-prepared transcript of the recorded conversation between Davis and his parents; and (5) the trial court erred in allowing Dr. Butts to testify about the cause of Davis’s behavior when Public Defender Dorothy Ferraro visited him in the jail. We also review the sufficiency of the evidence supporting Davis’s convictions for first-degree murder. As discussed below, we find each challenge to be either without merit or harmless, and affirm Davis’s convictions.
1. Hermione Harrell’s Testimony
We first review Davis’s hearsay challenge to the testimony of witness Her-mione Harrell. At trial, Harrell described the circumstances leading up to the shooting of Myosha Proby. Harrell explained that she took a shower while Proby called Davis. When Harrell got out of the shower, Proby looked upset. Proby told Harrell that she had called Davis, and that Davis was irate and seemed upset about something. They called Davis back. Harrell said that she could hear Davis yelling at someone else through the phone. As Proby was on the phone with Davis, she was mouthing words to Harrell. Over a hearsay objection by the defense, Harrell was allowed to tell the jury what Proby told her. Harrell said, “He told her, she repeated, he’s going to come kill me.”
Section 90.802, Florida Statutes (2009), states: “Except as provided by statute, hearsay evidence is inadmissible.” Davis argues that the trial court erred in overruling the defense’s hearsay objection to Harrell’s testimony. The State counters that although the trial court did not identify the basis for its ruling, the court could have admitted the statement either as a “spontaneous statement,” or as an “excited utterance.” The two exceptions are defined as follows:
The provisions of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:
(1) Spontaneous statement. — A spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness.
(2) Excited utterance. — A statement or excited utterance relating to a startling *481 event or condition made while the de-clarant was under the stress of excitement caused by the event or condition.
§ 90.803, Fla. Stat. (2009).
A trial court’s decision to admit evidence is reviewed under an abuse of discretion standard. See Hudson v. State, 992 So.2d 96, 107 (Fla.2008). “The trial court’s discretion is constrained, however, by the application of the rules of evidence and by the principles of stare decisis.” Hayward v. State, 24 So.3d 17, 29 (Fla.2009) (citations omitted). Additionally, “the trial court’s ruling on an evidentiary matter will be affirmed even if the trial court ruled for the wrong reasons, as long as the evidence or an alternative theory supports the ruling.” Muhammad v. State, 782 So.2d 343, 359 (Fla.2001).
We find that the statement at issue qualifies as an excited utterance. This Court has described the exception as follows:
The excited utterance exception contained in section 90.803(2) requires that the “statement or excited utterance” relate to “a startling event or condition” and be made while the declarant was under the stress of excitement caused by the event or condition. We have explained that to qualify as an excited utterance, the statement must be made: (1) “regarding an event startling enough to cause nervous excitement”; (2) “before there was time to contrive or misrepresent”; and (3) “while the person was under the stress or excitement caused by the event.” Henyard v. State, 689 So.2d 239, 251 (Fla.1996). This Court has observed that “[i]f the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement.” State v. Jano, 524 So.2d 660, 662 (Fla.1988) (quoting Edward W. Cleary, McCormick on Evidence § 297 at 856 (3d ed. 1984)). “While an excited utterance need not be contemporaneous to the event, it must be made while the declarant is under the stress of the startling event and without time for reflection.” Hutchinson v. State, 882 So.2d 943, 951 (Fla.2004) [abrogated on other grounds by Deparvine v. State, 995 So.2d 351 (Fla.2008) ]; see also Rogers v. State, 660 So.2d 237, 240 (Fla.1995).
Hudson, 992 So.2d at 107.
In this case, Proby’s statement satisfies the three prongs of the exception. First, the statement must be made “regarding an event startling enough to cause nervous excitement.” Henyard, 689 So.2d at 251. Here, Harrell testified that when she emerged from the shower, Proby looked upset. When they called Davis, Harrell could hear Davis yelling at another person through the phone. Other witnesses testified that Davis was not a violent person and that this behavior would have been out of character for him. After the phone call, Harrell encouraged Proby to call the police. Thus, the trial court could have properly found that the phone call was “startling enough to cause nervous excitement.” Id.
As to the second and third prongs, the statement must be made “before there was time to contrive or misrepresent” and “while the person was under the stress or excitement caused by the event.” Id. Here, Harrell testified that Proby made the statement as she was on the phone with Davis. “If the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement.” Jano, 524 So.2d at 662. In Hudson, for example, this Court held that a witness was permitted to testify concerning a phone conversation he had with a murder *482 victim just before the victim’s death. The victim told the witness that the defendant was in his house with a gun and that the defendant had announced his intent to kill the victim. See Hudson, 992 So.2d at 108. We found the statements admissible, explaining, “The statements were made while the event was ongoing, rather than being related after the event, negating the likelihood that [the victim] had time to contrive or misrepresent; and the statements were made while [the victim] was under the continuing stress or excitement caused by the event.” Id.
Similarly, in this case, Proby reported that Davis had announced his intent to kill her while she was still on the phone with him. The fact that the statement was made while the conversation was ongoing indicates that she did not have time to contrive or misrepresent, and that she was still under the stress of Davis’s death threat. Accordingly, we find that the trial court could have properly admitted the statement under section 90.803(2).[5]
2. Evidence of Davis’s Right to Remain Silent
We next address whether the jury was improperly presented with evidence that Davis invoked his right to remain silent. The factual basis for this claim arises from the video recording of Davis’s time at the sheriffs office. After Davis was arrested but before he was brought into the interrogation room, Detective Frank Ilarraza set up a video camera, which was switched on at 3:55 a.m. At approximately 4:35 a.m., Detective Ilarraza informed Davis of his Miranda[6] rights. Daws then invoked his right to remain silent and his right to counsel.
Prior to trial, Davis filed a motion asking the trial court to exclude the portion of the recording in which he invoked his rights. The motion asserted that Dr. Lori Butts had been retained by the court to evaluate Davis’s mental condition at the time of the crimes. The motion further asserted that in the defense’s deposition of Dr. Butts, she had expressed her opinion that Davis was not legally insane at the time of the crimes, basing her opinion in part on the fact that Davis asked for an attorney and invoked his right to remain silent. The trial court granted the motion. In its order, the court observed that Davis had filed a Notice of Insanity. Citing State v. Burwick, 442 So.2d 944 (Fla.1983), the trial court found that it was impermissible to rely on a defendant’s invocation of his or her rights as evidence of the defendant’s mental condition at the time of an offense. Accordingly, the trial court prohibited the State “from showing those portions of the audio/visual recording of the Defendant, while in custody, where he invokes his right to remain silent and asks for his attorney.”
A DVD of the recording was introduced at trial on June 29, 2009. Prior to the DVD’s admission, the State assured the trial court that the offending portions of the recording had been deleted. On that basis, the court allowed the DVD to be played to the jury. At first the recording proceeded without any difficulties. At the beginning of the recording, an analog clock on the wall of the interrogation room shows the time as 3:53 a.m. Davis is brought into the room approximately one minute later. Approximately forty-two minutes into the recording, Davis is seen *483 speaking with several police officers, including Detective Ilarraza. Shortly thereafter, the clock on the wall changes from 4:85 a.m. to 4:40 a.m. At 4:40 a.m., Detective Ilarraza is seen exiting the room, leaving Davis alone. Thus, the State properly deleted the portion of the recording in which Davis was informed of and invoked his Miranda rights.
However, a difficulty with the DVD was encountered during its exhibition at trial. In the DVD, Davis is seen alone in the room from 4:40 a.m. until 5:14 a.m. At 5:14 a.m., the clock on the wall changes to 4:25 a.m., returning to a section of the recording in which Davis was speaking with the officers. The trial record indicates that when the DVD returned to this earlier portion of the recording at trial, the parties and the court thought an error had occurred with the trial court’s video system. The prosecutor fast-forwarded the DVD to 5:55 a.m., shortly before Davis’s parents were brought into the room.
In fact, an error had occurred in the editing of the DVD itself. In the process of preparing the recording for trial, the State seemingly re-recorded a portion of Davis’s conversation with the police officers onto a later section of the DVD. In that time, Davis is seen speaking with the police officers from 4:25 a.m. until 4:35 a.m. Unlike the first time this conversation appears on the DVD, the recording does not immediately skip forward from 4:35 a.m. to 4:40 a.m. Instead, the recording continues for several additional seconds. In that time, Detective Ilarraza is seen explaining that he will advise Davis of his rights:
DET. ILARRAZA: ... [B]efore we go on to talking about what happened tonight, I have to go over your rights. You know what your rights are, right, under the law?
RALSTON DAVIS: Remain silent?
DET. ILARRAZA: Well, yeah. Let me go over them and then you can decide what you want to do, okay, it will be up to you.
At this point in the DVD, the screen freezes, and the clock skips forward to 4:40 a.m. Although the prosecutor fast-forwarded over this portion of the DVD at trial, the DVD was sent to the jury during its deliberations. The error was not discovered until the ease was being prepared for appeal.
Davis now argues that the submission of the challenged portion of the DVD to the jury violates the holding of Burwick and its progeny. In Burwick, this Court addressed following issue:
[Wjhether the state may introduce evidence of a defendant’s post-arrest conduct, including silence and the request to see an attorney after receiving Miranda warnings, as it relates solely to the issue of mental condition near the time of the offense when the defendant has asserted the insanity defense and the evidence is presented by the state in rebuttal.
442 So.2d at 945 (citation omitted). In that case, the defendant was charged with sexual battery and burglary with assault. Id. At trial, the defense presented evidence that Burwick was insane at the time of the offenses. In rebuttal, the State was allowed to present the testimony of the police officers who arrested Burwick. The officers testified that after Burwick was read his rights, he told the officers that he did not want to make a statement and shortly thereafter requested an attorney. Id. at 946-47.
This Court held that it was error to allow the State to use evidence of the defendant’s invocation of his right to remain silent to rebut the defense of insanity. We explained, “There is no dispute *484 that it is reversible error for the prosecution to attempt to impeach a defendant’s alibi testimony by asking on cross-examination why he remained silent at the time of his arrest.” Id. at 947 (citing Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975)). Discussing the Supreme Court’s decision in Hale, we concluded that just as evidence of a defendant’s silence may not be used as evidence of guilt, such evidence is similarly impermissible as evidence of the defendant’s mental condition. Id. at 948. We concluded:
It is fundamentally unfair for the state to lure Burwick into remaining silent and then impeach the man with this very same silence. To permit the state to benefit from the fruits of its own deceptions violates the due process clause of the fourteenth amendment and article I, section 9, of the Florida Constitution.
Id. We also observed that in Wainwright v. Greenfield, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the United States Supreme Court had similarly held that “because Miranda warnings carry an implied promise that ‘silence will carry no penalty,’ use of a defendant’s post-Miranda silence as evidence of sanity ... violates due process.” Garron v. State, 528 So.2d 353, 355 (Fla.1988) (quoting Greenfield, 474 U.S. at 295, 106 S.Ct. 634).
The question before us is whether the recording of Detective Ilarraza informing Davis that he will be read his Miranda rights is “fairly susceptible” of being interpreted as a comment on Davis’s silence. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986) (“In Florida, we have adopted a very liberal rule for determining whether a comment constitutes a comment on silence: any comment which is ‘fairly susceptible’ of being interpreted as a comment on silence will be treated as such.”) (citing State v. Kinchen, 490 So.2d 21 (Fla.1985); David v. State, 369 So.2d 943 (Fla.1979)). As we have explained, “commenting on the silence of an accused is not a viable strategy for obtaining convictions, and any comment — direct or indirect — by anyone at trial on this right is constitutional error that should be avoided.” Ventura v. State, 29 So.3d 1086, 1088-89 (Fla.2010) (original emphasis).
On the record in this case, however, we conclude that the rule of Burwick and its progeny was not violated. First, the reading and invocation of Davis’s Miranda warnings were not in fact recorded on the DVD that was submitted to the jury. While the DVD shows Detective Ilarraza explaining that Davis will be read his Miranda rights, that section of the recording stopped before the warnings were actually read. Second, no one commented on Davis’s invocation of his rights at trial. The trial court granted the defense’s motion to prohibit Dr. Butts from explaining that her conclusion regarding Davis’s sanity was based in part on his invocation of rights, and this ruling was adhered to by the prosecution and by all witnesses at trial. On this basis, we find that reversible error did not occur. Nonetheless, we caution that trial courts must be exceedingly careful in ensuring that a defendant’s invocation of his or her right to remain silent is not used against him or her as evidence of guilt.
3. Conversation Between Davis and His Parents
Next, we review the trial court’s decision to admit the portion of the interrogation room recording in which Davis spoke with his parents. At trial, Detective Joseph Carmody testified that when Davis was being arrested, a man approached identifying himself as Davis’s father. Mr. Davis asked to speak with his son. Detective Carmody told Mr. Davis that Davis had to *485 be taken to the hospital, but promised to call him when Davis arrived at the sheriff’s office. Later, Detective Carmody called Mr. and Mrs. Davis, who subsequently arrived at the sheriffs office and requested to see their son. The conversation between Davis and his parents, which lasted approximately forty minutes, was recorded on a video camera previously set up by Detective Frank Ilarraza. The trial court denied Davis’s motion to suppress the recording, which was played to the jury at trial.
On appeal, Davis argues that the recording was obtained in violation of “a clear expectation of privacy ... deliberately fostered by police officers.” See State v. Calhoun, 479 So.2d 241, 243 (Fla. 4th DCA 1985). “A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Rolling v. State, 695 So.2d 278, 291 (Fla.1997). We find that the trial court did not err in denying the motion to suppress.
Davis’s challenge is based on his contention that the police officers’ recording of the conversation was an unreasonable search under the Fourth Amendment of the United States Constitution. Under normal circumstances, individuals do not have any expectation of privacy while within police custody. As the Fourth District Court of Appeal has explained:
A citizen’s right to privacy under the Fourth Amendment of the Constitution of the United States is determined by a two prong test: 1) whether the citizen had a subjective expectation of privacy; and 2) whether that expectation was one that society recognizes as reasonable. State v. Smith, 641 So.2d 849, 851 (Fla.1994) (citing Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). Under this test, a prisoner does not have a right to privacy because areas of confinement do not share the same attributes as a private car, home, office, or hotel room. Id.
Surreptitiously made recordings of voluntary jailhouse conversations between inmates are admissible, “at least in the absence of any factor diminishing the trustworthiness of the conversation such as coercion or trick.” Allen v. State, 636 So.2d 494, 496-97 (Fla.1994).
Williams v. State, 982 So.2d 1190, 1194 (Fla. 4th DCA 2008); see also Hudson v. Palmer, 468 U.S. 517, 528, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (finding that the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell); Larzelere v. State, 676 So.2d 394, 405 (Fla.1996) (recognizing that “a person loses much of the right to an expectation of privacy during incarceration”).
However, we have also recognized that the recording of an inmate’s conversations may be improper if officers “deliberately fostered an expectation of privacy in the inmate’s conversation ... especially where the obvious purpose was to circumvent a defendant’s assertion of the right to remain silent.” Allen, 636 So.2d at 497. In Allen, an inmate argued that it was error for a trial court to admit evidence of a conversation between himself and another inmate that was obtained through electronic eavesdropping of their prison cells. Id. at 496. We affirmed the trial court’s decision to admit the evidence, finding that there was no expectation of privacy in the communications. Id. However, we cautioned that our conclusion “restfed] on the fact that there was no improper police involvement in inducing the conversation *486 nor any intrusion into a privileged or otherwise confidential or private communication.” Id. at 497. We cited State v. Calhoun, 479 So.2d 241 (Fla. 4th DCA 1985), as an example of a case in which the surreptitious recording was not permissible.
In Calhoun, defendant Calhoun, an inmate, was brought to an interview room. After speaking with officers about a case in which he was a suspect, and after being advised of his Miranda rights, Calhoun asked to speak with his brother privately. The brother, who was also an inmate, was brought into the room and their conversation was recorded. When officers returned to the room, Calhoun invoked his right to remain silent and his right to counsel. Although the officers terminated the interview, they then returned Calhoun’s brother to the interview room so that the brothers’ conversation could be recorded for investigative purposes. Calhoun, 479 So.2d at 242-43. The Fourth District affirmed the trial court’s decision to suppress the recorded conversations, explaining:
We agree with the state that the defendant usually would not have a reasonable expectation of privacy in the “jailhouse” or even in the interview room. However, we agree with the trial judge that the cases cited by the state are distinguishable on this record. The facts of this case reveal that the defendant had a clear expectation of privacy because such an expectation was deliberately fostered by the police officers. In this case, the defendant’s response to hearing his Miranda rights was that he would like to talk to his brother privately before talking to the officers. The police ostensibly complied with his request, brought in his brother, and exited the room giving every indication that the conversation was to be secure and private. Consequently, it was a justified expectation of privacy.
Id. at 243. The Fourth District also found it significant that the second conversation was recorded after Calhoun invoked his Miranda rights. The court observed, “Not only were these rights totally ignored by the police but the officers circumvented them by bringing the brother back into the room and then taping the conversation which is the subject of the motion to suppress.” Id.
Davis cites several cases in which similar results were reached. In Cox v. State, 26 So.3d 666 (Fla. 4th DCA 2010), the defendant was placed in an interrogation room, where he invoked his Miranda rights. Citing Calhoun, the Fourth District held that the trial court erred in failing to suppress a recorded phone conversation between the defendant and his codefendant, which occurred after the defendant was repeatedly assured by officers that he was not being recorded. Id. at 675-76.
The Tennessee Supreme Court reached the same conclusion in State v. Munn, 56 S.W.3d 486 (Tenn.2001). The defendant, a suspect in the murder of his college roommate, arrived at the police station accompanied by his parents and was placed in an interview room with a tape recorder on the table. The room was also equipped with a hidden video camera and hidden microphones. Id. at 488-89. After being questioned, the defendant asked the interrogating officers to turn off the tape recorder, which they did. The officers then asked the defendant’s mother if she wanted to speak with the defendant “by himself.” When she said yes, the officers excused themselves from the room and closed the door, leaving the defendant and his mother alone. The defendant subsequently made incriminating statements, which were secretly recorded. Id. at 494- *487 96. The Tennessee Supreme Court held that the officers’ actions created a subjective, reasonable expectation of privacy in the interview room, and that the trial court erred in failing to suppress the recorded statements. Id. at 496, 502.
Finally, in People v. A.W., 982 P.2d 842, 848-49 (Colo.1999), the Colorado Supreme Court held that a juvenile suspect had a reasonable expectation of privacy when he was left alone in an interrogation room with his father, where a detective had assured the suspect that “nothing or nobody was behind the two-way mirror” and that the detective would not be listening in on the suspect’s communications with his father.
Here, Davis argues that Detective Carmody fostered a sense of privacy in the interrogation room by excusing himself from the room, telling Davis’s parents to knock if they wanted him, and closing the door. Unlike the cases cited above, however, Detective Carmody never assured Davis and his parents that their conversation was private and took no actions designed to lead them to believe that the room was not under surveillance. In Williams, 982 So.2d at 1191-92, the defendant was placed in an interrogation room, where he invoked his rights, and was subsequently left alone. The defendant was then recorded having several conversations on his cell phone, in which he made incriminating statements. Id. The Fourth District held that the statements were not improperly admitted at trial, observing that the defendant was in police custody, and that “[t]he defendant did not ask for privacy, and there was no suggestion that he had any.” Id. at 1194. Similarly, in Johnson v. State, 730 So.2d 368 (Fla. 5th DCA 1999), the Fifth District held that the trial court did not err in failing to suppress a conversation between the defendant and his wife that occurred when they were left alone in an interview room at a police station. The court found no expectation of privacy where the husband and wife were never assured that their conversation was private, and the wife conceded that she did not know whether the room was being monitored. Id. at 370.
As in Williams and Johnson, the officers in this case did not take any action designed to “deliberately foster[] an expectation of privacy” in Davis’s conversation with his parents. See Allen, 636 So.2d at 497. We reject Davis’s contention that Detective Carmody’s simple act of closing the door was sufficient to create such an expectation. Because this case did not involve any specific or deliberate assurances of privacy, the general rule that suspects have no expectation of privacy in police custody controls. See Larzelere, 676 So.2d at 405. Accordingly, we hold that the trial court did not err in denying Davis’s motion to suppress the recording.
4. Admission of a State-Prepared Transcript
Davis also challenges the trial court’s decision to allow the jury to view a State-prepared transcript while watching the DVD. Prior to the publication of the DVD, defense counsel objected to the use of the transcript on the grounds that while he had read an earlier version of the transcript that was partially inaccurate, he had not been given the opportunity to verify the accuracy of the State’s revised transcript. The trial court responded that the defense would be permitted to voir dire the State’s authenticating witness. The State then presented the testimony of Detective Frank Ilarraza. Detective Ilarraza testified that he was in the interview room when certain portions of the DVD were recorded. When he was not in the room, he was watching the interview from a monitoring room. Detective Ilarraza said that he checked the transcript that was created *488 by a transcription service against the DVD and made corrections. He confirmed that the current transcript reflected what he heard on the DVD when it was recorded. On cross-examination, Detective Ilarraza conceded that he had no special training or expertise in transcription. When asked how he verified the accuracy of the transcript, he responded, “I just listened to it on a DVD player and I read the transcript and then made any corrections.” When correcting the transcript, Detective Ilarra-za listed words that did not make any sense to him as, “unintelligible.” Based on Detective Ilarraza’s testimony, the court ruled that the transcript was properly authenticated.
Before copies of the transcript were distributed to the jury, the trial court gave the following instruction:
Exhibit 44A has been identified as a typewritten transcript of the video statement that can be heard on the DVD recording received in evidence as Exhibit 44. I have admitted the transcript for the limited and secondary purpose of aiding you in following the content as you listen and view the DVD recording. However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the recording is entirely for you to determine based upon your own examination of the transcript in relation to your hearing of the DVD recording itself as the primary evidence of its own contents; and if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. Furthermore, since this is a limited and secondary exhibit, you will not have that — this will not go back with you to the jury room during your deliberations. In other words, you will not be able to just rely on the transcript. Should you wish to access or watch the video and you want to use the transcript, it will be done in open court with everyone here, it’s not going to be back in the jury room.
The transcript was subsequently distributed to the jury. While the DVD was being played, defense counsel again objected to the use of the transcript. Counsel explained that the jurors were looking only at the transcript. The trial court denied the objection, but instructed the jury:
Let me emphasize to you again, each of you have transcripts that you are utilizing in viewing and hearing the DVD, but remember, the transcripts are secondary, they are there to aid you. The evidence that you are to rely upon is the actual DVD, the video, as well as the audio. A lot of you are looking down a lot and listening to it, but you need to watch and listen and use the transcript as an aid, but it is no more than an aid. The evidence itself, that you are to rely upon, is the DVD.
In arguing that the trial court erred in admitting the transcript, Davis asserts that the court failed to follow the requirements of Martinez v. State, 761 So.2d 1074 (Fla.2000), in which this Court set out the procedures that trial courts must follow in authenticating and publishing a transcript of an audio or video recording. “The standard of review for the use of a demonstrative aid at trial is abuse of discretion.” Williams v. State, 967 So.2d 735, 752 (Fla.2007). While we agree that the trial court in this case failed to follow the requirements of Martinez, we hold that the error was harmless beyond a reasonable doubt.
In Martinez, 761 So.2d 1074, this Court directed trial courts to follow certain procedures when a party seeks to use a transcript as a demonstrative aid to an audio or visual recording. We stated:
*489 [T]rial courts should exercise extreme caution before allowing transcripts of recordings to be viewed by the jury. The preferred approach is for the parties to stipulate to the accuracy of the transcript. If there is a dispute as to the accuracy, the trial court should make an independent pretrial determination of the accuracy of the transcript after hearing from persons who can properly testify as to its accuracy. Those who may be able to verify the accuracy of the transcript are: (1) the actual participants to the conversation; or (2) those who listened to or overheard the conversation as it was being recorded, so long as such persons can establish that the quality of the conversation that they overheard or listened to was better at the time they overheard it than the quality of the tape recording.
We emphasize that there may be a difference between tape recordings that are difficult to hear and of poor quality and those that contain inaudible portions. Where the tapes are partially inaudible, jurors will be unable to make an intelligent comparison between the recording and the transcript. Under such circumstances, “[t]he practical effect of using an aid to comprehend unintelligible matter is that the aid becomes the evidence.” Accordingly, if the trial court determines that there are inaudible portions of the tape, the trial court should delete the inaudible portions from the transcript before submitting the transcript to the jury.
Martinez, 761 So.2d at 1086 (quoting United States v. Robinson, 707 F.2d 872, 878 (6th Cir.1983)) (footnote and citations omitted). The Court continued:
In addition ... where a transcribed version of an audio-video tape is used as an aid to the jury and there is no stipulation as to its accuracy, trial courts should give a cautionary instruction to the jury regarding the limited use to be made of the transcript.... The federal circuits that have considered this issue agree that whenever a transcript is allowed by the trial court, it is “important that the judge instruct the jurors that their personal understanding of the tape supersedes the text in a transcript.”
Id. at 1086-87 (quoting United States v. Slade, 627 F.2d 293, 302 (D.C.Cir.1980)) (footnotes and citations omitted).
In Williams v. State, 967 So.2d 735 (Fla.2007), this Court held that a transcript of a 9-1-1 call was not improperly admitted at trial. Reviewing the record, the Court held that the trial court sufficiently complied with the guidelines announced in Martinez. We observed:
During trial, the 911 operator who received the call from Dyke testified that she had compared the tape with the transcript, and concluded that the transcript was “a fair and accurate transcription of the recording.” Thus, the accuracy of the transcript was verified in court by an actual participant to the conversation. See Martinez, 761 So.2d at 1086. Further, because the parties did not stipulate to the accuracy of the transcript, the judge provided the following cautionary instruction to the jury: “State’s 41 is in evidence, that is the tape. The transcript is not in evidence. So, if there’s a conflict between the transcript that is not in evidence, and the tape that is in evidence, you are to rely on the tape that is in evidence.”
Williams, 967 So.2d at 752. We concluded that the record did not support the defendant’s argument that the trial court’s decision to admit the transcript was an abuse of discretion. Id.
Similarly, in McCoy v. State, 853 So.2d 396 (Fla.2003), the defense filed a pretrial motion to exclude both an audiotape and a *490 transcript of a recorded conversation between the defendant and his girlfriend. Id. at 402. The trial court listened to the tape and reviewed the transcript. The court ruled that the relevant portions of the tape were audible, and informed the defense that it would be permitted to argue to the jury that the transcript was not accurate. The court also instructed the jury that the transcript was not evidence and that the jurors should be bound by what they heard on the tape. The court further instructed the State to amend portions of the transcript that the court determined, based upon its own review, to be inaccurate. Additionally, the defendant’s girlfriend testified that she participated in the conversation recorded on the tape, verified that the tape accurately, reflected the conversation, and testified that she helped prepare the transcript. Id. at 402-03. We held that the trial court did not err in admitting the transcript, observing: “It is clear that the trial court scrupulously followed the guidance promulgated by this Court in Martinez, and we commend the court below for its fair and reasoned approach to the issues surrounding the audiotape and transcript at issue here.” Id. at 405.
In the instant case, we agree with Davis that in contrast to the trial judge in McCoy, the trial court did not “scrupulously follow[] the guidance promulgated by this Court in Martinez .... ” Id. As we explained in Martinez, “The preferred approach is for the parties to stipulate to the accuracy of the transcript.” 761 So.2d at 1086. In the absence of such a stipulation, “the trial court should make an independent pretrial determination of the accuracy of the transcript after hearing from persons who can properly testify as to its accuracy.” Id. Here, the parties did not agree that the transcript was accurate. Defense counsel in fact objected on the grounds that he had not been given the opportunity to verify the transcript’s accuracy.
Second, it is not clear from the trial record that Detective Ilarraza was competent to verify the accuracy of the entire transcript. We stated in Martinez: “Those who may be able to verify the accuracy of the transcript are: (1) the actual participants to the conversation; or (2) those who listened to or overheard the conversation as it was being recorded, so long as such persons can establish that the quality of the conversation that they overheard or listened to was better at the time they overheard it than the quality of the tape recording.” 761 So.2d at 1086 (emphasis added). Detective Ilarraza was present for certain portions of the video, and was clearly able to authenticate those parts of the conversation in which he was an actual participant. See McCoy, 853 So.2d at 404. As to the parts of the video in which he was not present, Ilarraza testified only that he observed the conversation from a “monitoring room.” Notably, he did not explain whether he was watching the conversation live, for example, through a two-way mirror, or whether he was watching the conversation through a video feed. Nor did he explain whether the audio and video quality of the conversation, as he perceived it, was better than the quality of the recording submitted at trial.
This case may be contrasted with the circumstances in Martinez. There, we found that the challenged transcript was properly authenticated by a detective who listened to the conversation as it was being recorded, and verified at trial that “Martinez ‘sounded so much clearer’ from the surveillance van than on the audio-video taped recording.” Id. at 1087. We explained, however, that under other circum *491 stances a witness may not be able to properly authenticate a recording:
[W]e caution that the trial court should not allow the validity of the transcript to be bolstered by testimony from those who simply listened to the tape after it was made.... [I]f the authenticating witness neither participated in nor overheard the recorded conversation as it was taking place, the authenticating witness would be “in no better position than the jury to determine the contents of the tape recording.”
Id. at 1087 (quoting Harris v. State, 619 So.2d 340, 343 (Fla. 1st DCA 1993)). Similarly, in the absence of verification that the conversation Detective Ilarraza observed was of better quality than the recording itself, he was not in any better position to authenticate the recording than any other person who simply viewed the recording after it was made.
Although the admission of a demonstrative aid is reviewed for abuse of discretion, Williams, 967 So.2d at 752, “[t]he trial court’s discretion is constrained ... by the application of the rules of evidence and by the principles of stare decisis.” Hayward v. State, 24 So.3d 17, 29 (Fla.2009). In failing to follow this Court’s instructions in admitting the transcript as a demonstrative aid, we find that the trial court abused its discretion.
This finding, however, does not end our inquiry. Having determined that the trial court erred in its admission of a demonstrative aid, we must review whether the error was harmless beyond a reasonable doubt. “The harmless error test ... places the burden on the tate, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
Davis alleges only one specific inaccuracy in the transcript. In the recorded conversation between Davis and his parents, Davis spoke at one point about how he was tasered by the police during his arrest. He stated that he had read newspaper articles about cocaine users being tasered by police officers and subsequently dying from the electrical shock. On the State-prepared transcript, Davis then states: “What, you know what? You might be right. That’s why they did that — ‘cause I have cocaine in my system. That’s why they tase me three times — I mean, I shake it off, like this.” As transcribed by the State, therefore, the conversation was evidence that Davis was under the influence of drugs at the time of the offenses. Davis, by contrast, contends that he did not state “I have cocaine in my system,” but rather that he said: “they have cocaine in their system,” in reference to the individuals who had died from being tasered. Thus, he maintains that he was explaining why the police used a taser on him (because they thought he was under the influence of cocaine), and why he was able to “shake it off’ (because he was not on drugs).
The accuracy of this portion of the transcript was heavily disputed at trial. Dr. Butts, the State’s mental health expert, testified that she thought Davis may have been on drugs in part because she believed she heard him admit on the DVD that he had cocaine in his system. Davis’s mother, the person he was speaking to at the time he made the statement, denied that he admitted using cocaine. Rather, she stated that he was talking about people who are tasered while on cocaine. In his closing argument, the prosecutor argued to the jury that Davis admitted to using cocaine on the DVD, which he maintained *492 supported a finding that Davis was on drugs at the time of the offenses and was not insane. In response, defense counsel argued that Davis did not say that he used cocaine, citing the testimony of Davis’s mother. Defense counsel also cited the testimony of other witnesses who said that Davis adamantly denied using drugs.
As discussed above, the trial court instructed the jury on more than one occasion that it was to rely on the video, not the transcript.
“[It is] the almost invariable assumption of the law that jurors follow their instructions.” Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987). “[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court’s instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.” Francis v. Franklin, 471 U.S. 307, 324, n. 9, 105 S.Ct. 1965, 1976, n. 9, 85 L.Ed.2d 344 (1985). See also Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) (in assessing prejudice for purposes of ineffective-assistance claim, “a court should presume ... that the judge or jury acted according to law”).
United States v. Olano, 507 U.S. 725, 740-41, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (alterations in original). Further, the transcript was not provided to the jury during deliberations. During deliberations, however, the jury asked to view the DVD, and was provided with the DVD and a DVD player.
Ultimately, we find that the erroneous admission of the transcript did not impact the jury’s ability to resolve for itself the meaning of Davis’s statement on the recording. The jury was instructed to rely on the video, not the transcript, in reaching its conclusions; the statement was heavily disputed by both witnesses and attorneys for both sides at trial; and the jury itself requested the DVD during deliberations, when it did not have access to the transcript. Thus, the jury was provided with accurate instructions as well as the means to evaluate Davis’s recorded statements. Because it is “presume[d] that jurors ... attend closely the particular language of the trial court’s instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them[,]” Franklin, 471 U.S. at 324 n. 9, 105 S.Ct. 1965 we find that the erroneous admission of the transcript was harmless beyond a reasonable doubt.
5. Dr. Butts’ Testimony
Davis next argued that the trial court erred in permitting Dr. Butts, the State’s mental health expert, to testify concerning possible causes of Davis’s behavior when Public Defender Dorothy Ferraro saw him in jail. During the defense’s presentation of evidence, Ferraro testified that she visited Davis in jail several weeks after his arrest. When she was brought to Davis’s holding cell, Davis was jumping up and down and yelling gibberish. Ferraro heard Davis say something about a lawyer, but the statement was out of context and unintelligible. Ferraro testified that she felt Davis was mentally unstable. In rebuttal, the State presented the testimony of Dr. Butts, who believed that Davis was malingering in the period after his arrest. Dr. Butts was asked whether she observed Ferraro’s testimony. Dr. Butts testified that based on her review of notes by Davis’s girlfriend, Davis may have been behaving erratically not because he was mentally ill, but because he was angry because he did not want a public defender.
Prior to Dr. Butts’ testimony, the State proffered her testimony. Dr. Butts dis *493 cussed her conclusions regarding Ferraro’s testimony. She stated:
What I gleaned from Ms. Ferraro’s testimony was that [ ] Davis was very upset in the holding cell when she initially came to talk with him. After reviewing the records, including the DVD, there’s a logical conclusion that is separate and apart from mental illness as to why [] Davis’ behavior appeared to be irrational. From the DVD, he said he would recommend to anyone to invest in a lawyer instead of hoping a public defender would help you. And also, from his girlfriend’s notes, she wrote in her notes that he told her that he was upset because they sent him a public defender and he didn’t want a public defender, he wanted a private attorney.
Based on Dr. Butts’ proffered testimony, the prosecutor asked that the court allow her to testify to her conclusion that Davis was angry because he did not want a public defender. The prosecutor explained that he would not ask Dr. Butts any questions regarding Davis’s invocation of his right to counsel. In response, defense counsel argued that Dr. Butts’ testimony as to Davis’s motivations was speculative. The trial court overruled the defense’s objection, finding that the testimony was relevant under sections 90.401 and 90.403, Florida Statutes (2009), and that “any objection regarding the nature of the evidence, particularly whether it is speculation or the like, goes to the weight and not to the admissibility.”
Davis argues that the trial court’s decision was error because Dr. Butts’ opinion was speculative in nature. “A trial judge’s ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion.” Alston v. State, 723 So.2d 148, 156 (Fla.1998). We find that the trial court was within its discretion in admitting Dr. Butts’ testimony. Section 90.704, Florida Statutes (2009), provides:
The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
Here, Dr. Butts was admitted as an expert in forensic psychology. She testified that she had reviewed documents and records related to Davis’s ease, including the DVD, and concluded that Davis was not mentally ill at the time of the offense to such an extent that he would have been unaware of the wrongfulness of his conduct. In voir dire, Dr. Butts testified that she was relying on the DVD recording of Davis at the sheriffs office, as well as notes by Davis’s girlfriend, in determining that Davis may not have been mentally ill when he was visited by Dorothy Ferraro. Davis has not argued that the data on which Dr. Butts relied in forming her opinion — the DVD and the notes of Davis’s girlfriend — was not “of a type reasonably relied upon by experts in [her] subject to support the opinion expressed.” § 90.704, Fla. Stat. (2009). Accordingly, we find that Davis has not demonstrated that the trial court abused its discretion.
6. Sufficiency of the Evidence
Finally, we review the sufficiency of the evidence supporting Davis’s convictions for first-degree murder. This issue has not been addressed by either party. In death penalty cases, however, regardless of whether the appellant raises the issue, this Court must conduct an independent review to determine whether sufficient evidence exists to support a first-degree murder conviction. See Fla. R.App. P. 9.142(a)(6); Phillips v. State, 39 *494 So.3d 296, 308 (Fla.2010). The evidence in a capital case is judged to be sufficient when it is both competent and substantial. See Phillips, 39 So.3d at 308. In conducting its review, this Court “view[s] the evidence in the light most favorable to the State to determine whether ‘a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.’ ” Rodgers v. State, 948 So.2d 655, 674 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
In this case, Davis was charged with three counts of first-degree murder, in violation of section 782.04(l)(a)l, Florida Statutes (2009). Under section 782.04(l)(a)l, murder in the first degree is defined as the unlawful killing of a human being “perpetrated from a premeditated design to effect the death of the person killed or any human being.” Davis did not contest at trial that he killed the three victims, but contended that he was insane at the time of the offenses. Davis has not argued that the jury was not entitled to reject the insanity defense, and competent substantial evidence supports the jury’s verdict on the three counts of first-degree murder. Hermione Harrell testified that she observed Davis shoot Myosha Proby with an assault rifle. Ebony Deadwyler and John Diggs both testified that they saw Davis shoot Ravindra Basdeo as Bas-deo was sitting in his car in front of the Exxon gas station. Deadwyler and Diggs also saw Davis shoot the third victim, Carlos Jones, as Jones exited the gas station. Elaine Consuegra-Rodríguez, the firearm examiner, testified that the shell casings recovered from the crime scenes were fired from the rifle recovered from Davis’s vehicle.
Based on the evidence submitted at trial, a reasonable trier of fact could have found that the elements of first-degree premeditated murder were proven beyond a reasonable doubt. See Rodgers, 948 So.2d at 674. Accordingly, we affirm the three convictions for first-degree murder.
B. Penalty Phase Issues
In its sentencing order, the trial court imposed sentences of life imprisonment for the first-degree murders of Ravindra Bas-deo and Carlos Jones, and a sentence of death for the first-degree murder of Myo-sha Proby. On appeal, Davis raises several challenges to his death sentence. We find three of these challenges to be dispos-itive and reverse the sentence of death.
1. CCP
We first review the trial court’s finding that the murder of Myosha Proby was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). See § 921.141(5), Fla. Stat. (2009). When this Court evaluates a trial court’s decision finding an aggravating circumstance to have been proven beyond a reasonable doubt, the following standard of review applies:
[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job. Rather, [this Court’s] task on appeal is to review the record to determine [1] whether the trial court applied the right rule of law for each aggravating circumstance and, if so, [2] whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnotes omitted). “Competent, substantial evidence is tantamount to legally sufficient evidence.” Blackwood v. State, 946 So.2d 960, 973 (Fla.2006) (quoting State v. Coney, 845 So.2d 120, 132-33 (Fla.2003)).
*495 “A court must consider the totality of the circumstances when determining whether a murder was committed in a cold, calculated, and premeditated manner.” McGirth v. State, 48 So.3d 777, 793 (Fla.2010). For a trial court’s CCP finding to be considered legally sufficient, the evidence must satisfy a four-part test:
(1) [T]he killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.
Lynch v. State, 841 So.2d 362, 371 (Fla.2003) (citing Evans v. State, 800 So.2d 182, 192 (Fla.2001)).
“The CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant.” Wright v. State, 19 So.3d 277, 298 (Fla.2009). “ ‘CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2000)). For a murder to be CCP, the defendant must have committed the murder in a “deliberate, professional, and coldly calculating manner.” Williams v. State, 37 So.3d 187, 197 (Fla.2010) (quoting Mahn v. State, 714 So.2d 391, 398 (Fla.1998)). “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’ ” Franklin v. State, 965 So.2d 79, 98 (Fla.2007) (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)).
The record in this case does not support the trial court’s CCP finding. Concerning the heightened premeditation element of CCP, this Court has stated:
Simple premeditation of the type necessary to support a conviction for first-degree murder is not sufficient to sustain a finding that a killing was committed in a cold, calculated, and premeditated manner. A heightened form of premeditation is required which can be demonstrated by the manner of killing. To achieve this heightened level of premeditation, the evidence must indicate that a defendant’s actions were accomplished in a calculated manner, i.e., by a careful plan or a prearranged design to kill.
Besaraba v. State, 656 So.2d 441, 444 (Fla.1995) (quoting Holton v. State, 573 So.2d 284, 292 (Fla.1990)) (emphasis added).
The facts of this case are inconsistent with a finding that the murder was committed as part of a “careful plan or prearranged design to kill.” Id. In finding CCP, the trial court relied on the fact that Davis purchased the rifle several days before the murders. However, witness Red-dick, who sold Davis the rifle, testified that he was the one who mentioned to Davis that he had a rifle he was planning to sell; Davis did not ask him for a rifle. In Williams v. State, 37 So.3d 187, 195 (Fla.2010), we reversed a trial court’s finding of CCP that was based in part on the defendant’s purchase of a hasp and lock on the day of the murder, which the trial court found was done “with the intent to secure the eventual crime scene.” In finding this conclusion not supported by the record, we stated:
While it is true that the hasp and lock could have been purchased with the intent to secure the scene of a murder that had yet to occur, that conclusion is speculative. While circumstantial evi *496 dence can be used to support CCP, “the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor.”
Id. at 196-97 (quoting Harris v. State, 843 So.2d 856, 866 (Fla.2003)) (original emphasis). We went on to observe that the purchase of the hasp and lock was “the only piece of evidence that could be construed as advance planning,” and that “[a]ll of the other evidence presented establishes that the provocation for the murder arose at the time of the [defendant’s] argument” with the victims. Id. at 197.
Similarly, in this case, all other evidence established that Davis’s decision to kill Proby was spontaneous, occurring while Davis was in the midst of a psychotic episode. Davis’s mother and sister testified concerning Davis’s apparent mental breakdown in the days leading up to the murder. The defense’s mental health experts — Dr. Ribbler, Dr. Brannon, Dr. Strauss, and Dr. Day — testified that Davis was suffering from a temporary organic psychotic disorder at the time of the offenses. The State’s expert, Dr. Butts, believed that Davis’s psychosis was drug induced rather than organic, but nonetheless agreed that Davis was suffering from some type of psychosis and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Davis testified during the penalty phase that he was beaten on the night of the murders, which was supported by the testimony of numerous witnesses who observed that Davis was bleeding from the mouth and looked as if he had been in a fight. When Proby called him shortly thereafter, Davis testified that he took it as a sign from God that his “mission” was to kill her. Davis’s statements both to Proby — that she “set [him] up” — and to his parents after his arrest — that he killed Proby because she “betrayed” him — indicated that Davis killed Proby because he believed she was responsible for his beating. Regardless, it is undisputed that Davis did not threaten to kill Proby until Proby first called him.
Further, Davis’s behavior was inconsistent with a careful plan or prearranged design to murder Proby. On the way to Proby’s apartment, Davis was observed stopping his car at a green light in the middle of an intersection and firing his gun in the air. When Davis arrived at Proby’s apartment minutes after speaking to her on the phone, he made no attempt to conceal his presence, but rather left his car running with music blaring from the speakers, as he walked past witness Jason Rolle with the gun in hand. Before and after his murder of Proby, Davis made no effort to eliminate Hermione Harrell, who was in the room at the time of the murder. After leaving the scene of Proby’s murder, a 9-1-1 call reported that a man was waving a gun out of his car window. Davis subsequently murdered two men, apparently at random, in the middle of a crowded parking lot. The law enforcement officers involved in Davis’s pursuit and arrest testified concerning his erratic, strange, and uncontrolled behavior following the murders.
This case is comparable to Besaraba v. State, 656 So.2d 441 (Fla.1995). There, the defendant, a homeless man, was yelled at by a bus driver for having an alcoholic beverage on the bus. The driver, Gran-ger, told Besaraba to dispose of the beverage or leave the bus. Besaraba left the bus.
Besaraba then rode another bus to the Young Circle transfer site in Hollywood, and sat on a bench. After approximately a half-hour, Granger’s bus pulled into the site. Besaraba walked up to Gran- *497 ger’s bus with a drawn handgun, fired a volley into the side of the bus, walked to the front door and fired a shot into Granger’s neck, killing him. Besaraba then fired another shot into passenger Wesley Anderson’s back, killing him. Besaraba walked away from the transfer site, approached a car waiting at a red light, and ordered the driver, Scott Ya-guda, out of the vehicle. As Yaguda walked away, Besaraba shot him in the back three times.
Besaraba, 656 So.2d at 442. A mental health expert testified at trial that Besara-ba had a history of health problems, including paranoid tendencies, psychotic or paranoid behavior, and delirium. Id. In finding that the evidence did not support the trial court’s finding of CCP, we stated:
[T]he random nature of Besaraba’s acts during the crimes belies a careful plan.... The shootings of Anderson and Yaguda were entirely indiscriminate; neither person posed a threat of any kind to Besaraba or acted to interfere in his actions. Each was shot in the back. Besaraba’s acts were undertaken in front of numerous witnesses and he made no attempt to conceal his identity.
Id. at 445.
In addition, we noted “the presence of strong mental health mitigating circumstances that weigh against the formulating of a careful plan to kill Granger.” Id. In its sentencing order, the trial court had found that Besaraba was under the influence of great mental or emotional disturbance at the time of the murders. The trial court noted the testimony of a mental health expert who opined that Besaraba was experiencing a psychotic episode, triggered by his confrontation with the bus driver. The trial court also took note of evidence that Besaraba was drinking alcohol at the time of the crimes. We concluded that, based on this evidence, the record did not show beyond a reasonable doubt that the murder of Granger was part of a careful plan. We stated: “Although the record may reflect a suspicion that such a plan existed, this is insufficient to support this aggravating circumstance.” Id. at 445-46.
Here, the record reflected, at best, a suspicion that Davis planned to kill Proby in advance. As we explained in Williams, however, ‘While circumstantial evidence can be used to support CCP, ‘the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor.’ ” 37 So.3d at 196-97 (quoting Harris, 843 So.2d at 866). We hold that the CCP aggravator is not supported by competent, substantial evidence, and strike the trial court’s finding.
2. HAC
We also review the trial court’s finding that the murder in this case was especially heinous, atrocious, or cruel (HAC). See § 921.141(5)(h), Fla. Stat. (2009). HAC has been defined by this Court as follows:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
State v. Dixon, 283 So.2d 1, 9 (Fla.1973).
This Court has emphasized that in order to qualify as HAC, “the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim.” *498 Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992). The aggravator “is proper only in torturous murders — those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another.” Rimmer v. State, 825 So.2d 304, 329 (Fla.2002) (quoting Shere v. State, 579 So.2d 86, 95 (Fla.1991)). Additionally, this Court has held that even in the absence of physical suffering on the part of the victim, “fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” James v. State, 695 So.2d 1229, 1235 (Fla.1997).
As part of an evaluation of whether the defendant’s act and conduct is cruel by being designed to inflict a high degree of pain or utter indifference to, or even enjoyment of, the suffering of others, we have also emphasized that “the focus should be upon the victim’s perceptions of the circumstances as opposed to those of the perpetrator.” Lynch v. State, 841 So.2d 362, 369 (Fla.2003) (emphasis supplied); see also Oyola v. State, 99 So.3d 431, 433 (Fla.2012) (“In evaluating whether HAC is present, a trial court focuses on the victim’s perception of the circumstances — not the perpetrator’s viewpoint.” (emphasis in original)).
[T]o support this aggravator, the evidence must demonstrate that the victim was conscious and aware of impending death. Douglas v. State, 878 So.2d 1246, 1261 (Fla.2004). However, we have explained that the actual length of the victim’s consciousness is not the only factor relevant to this aggravating circumstance. Beasley v. State, 774 So.2d 649, 669 (Fla.2000). “[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” James v. State, 695 So.2d 1229, 1235 (Fla.1997). We have further held that the actions of the defendant preceding the actual killing are also relevant. Gore v. State, 706 So.2d 1328, 1335 (Fla.1997) (citing Swafford, 533 So.2d [270, 277 (Fla.1988) ], and Smith v. State, 424 So.2d 726, 733 (Fla.1982)).
Hernandez v. State, 4 So.3d 642, 669 (Fla.2009) (emphasis supplied). See also Zakrzewski v. State, 717 So.2d 488, 492-93 (Fla.1998); Wyatt v. State, 641 So.2d 1336, 1341 (Fla.1994). Additionally, this Court must evaluate the victim’s mental state “in accordance with common-sense inferences from the circumstances.” Hernandez, 4 So.3d at 669 (citing Swafford, 533 So.2d at 277).
According to Hermione Harrell, who was in Proby’s apartment at the time of the incident, Proby spoke with Davis approximately fifteen minutes before he arrived at the apartment. During this phone conversation, some of which Harrell overheard, Davis threatened Proby that he was coming to kill her. Harrell stated that she advised Proby to call the police.
Even if Proby did not initially fully believe the sincerity of Davis’s threat during the phone call, most assuredly it is reasonable to conclude that she believed him once she opened the front door of her apartment and saw Davis ready to enter with an automatic weapon. Davis entered the apartment holding an AR-15 assault rifle, and according to Harrell, immediately directed his attention toward Proby. Harrell stated that the appearance of Davis’s eyes suggested that he had been smoking or drinking, and that she had “never seen [Davis] like that.” He was dressed in all black — a black pullover hoodie, black pants, and black shoes. Jason Rolle, who was walking to his cousin’s apartment in *499 the complex at the same time as Davis arrived at Proby’s door, testified that he noticed Davis was bleeding from the mouth and nose. Rolle also testified Davis looked “pissed off’ and as if he had just been in a fight. Although Rolle stated that the sight of a man carrying a gun with “two clips” in the apartment building did not disturb him, he quickly retreated to the back of the building and called his cousin to tell him to stay inside once Rolle heard Davis cock his gun and “bang” on Proby’s apartment door.
Harrell testified that once inside the apartment, Davis began yelling at Proby, “[y]ou set me up, you set me up,” to which Proby stated “[t]hat wasn’t my brother,” and Davis responded, “I know.” Harrell stated that Davis continued to yell at Pro-by “you set me up” before eventually ordering Proby to “[g]et the f* * ⅜ down.” In response to Davis’s orders, Proby got on her knees. She had her arms folded and her back to Davis as she awaited her ultimate fate. She was in that execution-style position when Davis began firing the weapon at her.
An HAC determination is analyzed from the victim’s perspective — not the defendant’s. A court evaluating the HAC aggravating circumstance considers whether the victim was conscious and aware of her impending death. An HAC determination may be found even if the victim did not experience a protracted death. This Court has consistently held that a quick death is not determinative of whether the victim suffered unnecessarily. See Lynch, 841 So.2d at 369; James, 695 So.2d at 1235; Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996); Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992).
Based on Harrell’s and Rolle’s descriptions of Davis and the events preceding the murder, it seems clear that Proby experienced “ ‘real and excruciating1 mental anguish and [had an] acute awareness of her impending death” to justify the trial court’s finding of HAC. Farina v. State, 801 So.2d 44, 53 (Fla.2001). Regardless of whether Proby was fully convinced that Davis would kill her following their earlier phone conversation, it is most reasonable to conclude that she understood the sincerity of his threat upon seeing Davis — who was dressed in all black, bleeding from the face, carrying an assault rifle, and yelling accusations at her — at her door. Davis’s words and actions clearly indicated he was enraged and intent on killing Proby. We have no doubt this was not lost on her before she died.
Before her death from Davis’s first gunshot, Proby had sufficient time to reflect on her circumstances and thereby experience intense emotional terror and strain. We therefore conclude that the record sufficiently supports the trial court’s finding of the HAC aggravator.
3. Proportionality
Finally, we must determine whether Davis’s death sentence is proportionate. See Wade v. State, 41 So.3d 857, 879 (Fla.2010). The purpose of this Court’s proportionality review is “to prevent the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Parker v. State, 873 So.2d 270, 291 (Fla.2004). In conducting this review, this Court conducts a two-pronged inquiry to “determine whether the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.” Almeida v. State, 748 So.2d 922, 933 (Fla.1999) (original emphasis). However, the proportionality analysis “is not a comparison between the number of aggravating and mitigating circumstances.” Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, [the analysis] en *500 tails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator.’ ” Simpson v. State, 3 So.3d 1135, 1148 (Fla.2009) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)) (original emphasis). This analysis requires us to “consider the totality of the circumstances of the case and compare the case to other capital cases.” Offord v. State, 959 So.2d 187, 191 (Fla.2007).
Following our determination that the trial court erred in finding CCP, three aggravators remain applicable to the murder of Myosha Proby. In finding the first aggravator, HAC, the trial court concluded “[t]here can be no doubt that Ms. Proby suffered immeasurable fear and terror as the events played out, from the inception when Defendant stated on the phone that he was going to come kill her, to the point when he showed up at the door with the rifle in hand ... followed by the Defendant, while still armed, making accusatory statements ... and then ordering her to the floor.” The trial court accorded this factor “great weight.” The second, that Davis “has been previously or contemporaneously convicted of another capital felony,” was based upon the contemporaneous first-degree murders of Ravindra Basdeo and Carlos Jones. The trial court assigned this aggravating circumstance “great weight.” As to the third aggravator, that the murder “was committed while [Davis] was engaged in the commission of a burglary,” the trial court acknowledged that “while the facts of this case technically meet the requirements of a burglary, the facts are not such that he broke into Ms. Proby’s apartment or was lying in wait for her to come home.” The court assigned the burglary aggravator “slight weight.”
Although the contemporaneous murders and HAC are significant and weighty aggravation, the mitigating evidence in this case was also substantial. As statutory mitigation, the trial court considered Davis’s age of twenty-one years old, as well as the fact that “he had never been previously arrested or convicted of any crimes, and has no history of violent criminal activity.” Furthermore, the trial court found both of the statutory mental health mitigating circumstances. The court concluded that the murder was committed while Davis was under the influence of extreme mental or emotional disturbance, and that Davis’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. See § 921.141(6)(b), (f), Fla. Stat. (2009). These mitigators were based on the unanimous testimony of five mental health experts that Davis was suffering from some type of psychosis at the time of the offenses.
Mental health evidence of this type is significant to our proportionality determination. In order for a sentence of death to be proportionate, the capital offense must be among the most aggravated and the least mitigated of first-degree murders. See Almeida, 748 So.2d at 933. When presented with “substantial and uncontro-verted evidence” that the defendant’s actions were the product of mental illness, “[w]e have consistently recognized such mitigation as among the most compelling.” Green v. State, 975 So.2d 1081, 1088 (Fla.2008).
We have previously vacated sentences of death in cases where the capital crime was committed spontaneously and as a result of mental illness. In Green, for example, the evidence established that after being invited into the home of a friend, the defendant grabbed his friend’s handgun, demanded the keys to the friend’s car, and then shot him in the head. Green drove to a nearby pasture, where he shot a bull that was *501 grazing there. On his way back from the pasture, Green passed a retired police officer, whom he asked for directions and then also shot. Green returned to his mother’s home, where he showed a friend the car he had stolen and confessed to shooting two people. Id. at 1083-84. In finding the sentence of death disproportionate, we observed that Green had a substantial history of mental illness; the trial court described Green’s life since age thirteen as “a psychological, emotional, and antisocial free fall into an abyss of aberrational, delusional and psychotic behavior.” Id. at 1089.
Similarly, in Almeida, 748 So.2d 922, we overturned a death sentence based upon substantial mental health mitigation. The defendant in that case was thrown out of a bar by the bar’s manager for drinking while underage. Several hours later, the defendant obtained a handgun, returned to the bar, and shot the manager. Id. at 924-25. The defendant described the killing to police “as an impulsive act committed shortly after he had left his friends and got drunk by himself.” Id. at 933. The trial court found both mental health miti-gators were established, and we found that the record was “replete with testimony of witnesses attesting to Almeida’s lack of impulse control due to his brutal childhood in Brazil.” Id. In addition, “witnesses testified that Almeida was particularly unstable at the time of the crime because of his recent marital separation and pending divorce.” Id. Based upon this evidence, we held the death sentence disproportionate. Id. at 934.
We have held sentences of death to be disproportionate in a large number of other cases involving substantial mental health mitigation. See, e.g., Offord v. State, 959 So.2d 187, 193 (Fla.2007) (vacating death sentence based on “extensive documented history of Offord’s lifelong mental illness and repeated institutionalization”); Robertson v. State, 699 So.2d 1343, 1347 (Fla.1997) (vacating death sentence “in light of the substantial mitigation present,” which included the defendant’s age, impaired capacity, abused and deprived childhood, history of mental illness, and borderline intelligence); Kramer v. State, 619 So.2d 274 (Fla.1993) (vacating death sentence, finding that “[t]he factors establishing alcoholism, mental stress, severe loss of emotional control, and potential for productive functioning in the structured environment of prison are dispositive”); see also Green, 975 So.2d at 1089 n. 3 (identifying additional capital cases in which sentences of death have been vacated due to extensive mental mitigation).
In evaluating the proportionality of the death sentence in this case, we also take note of Davis’s extensive history of abuse and neglect. Evidence presented during the penalty phase established that due to strained finances, Davis’s parents sent him to live with relatives in Jamaica on several occasions. These relatives failed to properly care for Davis and physically abused him. Evidence was also presented that Davis was subjected to sexual abuse when he was twelve or thirteen years old. When Davis was in high school, a close friend was stabbed in front of him and died in his lap. Dr. Brannon testified during the penalty phase that this incident likely contributed to Davis’s mental deterioration in the period leading up to the capital offenses.
The record demonstrates that this case is not among the most aggravated and least mitigated of first-degree murders. On that basis, we vacate the sentence of death.
III. CONCLUSION
For the reasons stated in this opinion, we affirm the appellant’s convictions for *502 first-degree murder, but reverse the sentence of death and remand the case to the trial court for the imposition of an additional sentence of life imprisonment.
It is so ordered.
LEWIS and LABARGA, JJ., concur.
POLSTON, C.J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.
QUINCE, J., concurs in part and dissents in part with an opinion, in which PARIENTE and PERRY, JJ., concur.

. The State’s mental health expert, Dr. Lori Butts, testified that Davis’s refusal to allow any medical procedure that punctures the skin was consistent with his Rastafarian belief system.

. Davis’s sister, Ruth Davis, testified that she was present at that time and largely confirmed Mrs. Davis’s account of Davis's behavior. Ruth Davis said that her brother was fidgeting, would not make eye contact, and was talking about God, which was unusual for him. She observed Davis tell their mother that he wanted to be a "DJ for God.”

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court found as nonstatutory mitigation: (1) Davis grew up in a poor environment (slight weight); (2) Davis was abandoned as a child several times (little weight); (3) Davis was physically and mentally abused as a child (little weight); (4) Davis comes *480 from a broken home (slight weight); (5) Davis has shown compassion and generosity (slight weight); (6) Davis has displayed proper courtroom behavior (slight weight); (7) the victim was rendered unconscious immediately (slight weight); (8) Davis loves and cares for his mother, his son, and his brothers and sisters (little weight); (9) Davis lacked support and guidance from his parents as a child (slight weight); and (10) Davis can be rehabilitated, has an average IQ, does not suffer from a learning disability, is not a psychopath and does not have an anti-social personality disorder (slight weight).

. Because we find the statement admissible as an excited utterance, it is unnecessary for us to determine whether the statement would also be admissible as a spontaneous statement, as defined under section 90.803(1). See Hudson, 992 So.2d at 109 n. 7.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).